Blackmore et al., Appellants, *v.* Public Service
Commission et al.

Argued September 30, 1935.

Before
KELLER, P. J., BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Clarence J. Wing,* with him *James G. McDonough,* for appellant.

*Samuel Graff Miller,* with him *Harry H. Frank, John C. Kelley* and *Richard J. Beamish,* for appellee.

*Gilbert Nurick,* for intervening appellee.

OPINION BY PARKER, J., January 31, 1936:

The Public Service Commission of this Commonwealth instituted an inquiry and investigation upon its own motion for the purpose of determining the character of the motor vehicle operations conducted by appellants, and thereafter Carriers' Protective Committee, an organization representing various railroads and certified truck operators, was permitted to intervene as a party complainant. After service of notice of the proceeding upon the respondents, an answer was filed by Annie Blackmore, president of A. Blackmore Transfer Company, Inc., on behalf of that company and the other

respondents in which there was set up as a sole defense the allegation that all business conducted by each of the defendants was interstate commerce and therefore not under jurisdiction of the Public Service Commission of this Commonwealth. After hearing and arguments, the commission made an order finding that certain motor vehicles had been operated by appellants as common carriers in violation of the Public Service Company Law and that A. Blackmore Transfer Company, Inc., had operated in violation of the law of this state on twenty separate occasions between March 21 and July 13, 1934, inclusive; and that all of the appellants had "under various guises and fictitious names operated transportation activities in violation of the Public Service Company Law." It directed the corporation to pay to the Commonwealth of Pennsylvania the sum of one thousand dollars and ordered each of the appellants to cease and desist from such operations. From that order an appeal has been taken to this court.

The operations of appellants found by the commission to be in violation of law were of three different types, were considered separately on argument by the parties, and, as they involve different legal principles, we will take them up in the same manner. They are: (1) a movement of mixed merchandise between termini in the state of Pennsylvania and wholly within the state; (2) like movements of silk and silk products where it is claimed by the appellants that the transportation was a part of an interstate movement; and (3) movements of freight between termini within this state but transported between these points over a route partly in the state of New Jersey, where it was found by the commission that such movements as took place in the state of New Jersey were mere subterfuges of the respondents to avoid regulation of purely intrastate transportation by our commission.

1. Witnesses were called who furnished evidence

tending to show that about July 11, 1934, the A. Blackmore Transfer Company, Inc., moved a truck loaded with freight from Dunmore, near Scranton, to Easton over a route wholly within the state when a part of the load was transferred to another truck and carried to and delivered at Allentown, and the remainder of the load was taken by the original truck from Easton to Philadelphia. While the inspectors employed by the appellees followed the movement south of Easton toward Philadelphia for only a few miles and to a point beyond the place where the roads by the usual routes led to New Jersey, any deficiency in the proofs with respect to the ultimate destination at Philadelphia was supplied by the testimony of the appellants' own witness, the driver of the truck, and others. The appellants in their argument attack this finding on the ground that appellants' witnesses and not appellees' witnesses should be believed. This raised a pure question of fact which was for the commission and not for this court under numerous decisions: Motor Freight Express v. P. S. C., 117 Pa. Superior Ct. 174, 177 A. 493; Waer Bus Co. v. P. S. C., 117 Pa. Superior Ct. 514, 178 A. 157; Vance Transportation Co. v. P. S. C., 105 Pa. Superior Ct. 228, 161 A. 428; York Express Co. v. P. S. C., 110 Pa. Superior Ct. 197, 168 A. 327.

A careful reading of the entire testimony convinces us not only that there was ample evidence to sustain the finding of the commission that this movement was intrastate transportation, but that the credibility of appellants' witnesses was so shaken on cross-examination that we are unable to see how the commission could have come to any other conclusion than it did. As there were numerous other violations which we will consider under the next heading where there is no dispute as to the facts and a pure question of law is involved, it is not necessary to depend upon this one

offense to sustain the commission's order. It is not probable that the commission would have issued a cease and desist order if this had been the sole violation by appellants.

The fourteenth assignment of error is to the refusal of an offer of appellants to show by one of them that the president of the Arrow Carrier Corporation had made certain threats against one of appellants and that one of the witnesses, Mr. Duffy, called to sustain the charge concerning this one shipment, was an employee of that corporation, for the purpose of affecting the credibility of such employee. We think, as the examiner ruled, that this was going too far afield to affect the credibility of the witness who had just testified. If the offer had been to show threats of the witness it would clearly have affected his credibility. Taking into account the facts that it appeared that the Arrow Company was a rival of the appellants and that it was admitted of record that Mr. Duffy was an employee of a rival concern and employed as a solicitor to obtain business in the same field, we are satisfied in any event that no harm was done to the appellants. The fourteenth assignment of error is not sustained.

2. We are next concerned with certain movements of raw silk and silk products. It was established by abundant proofs and, in fact, admitted by appellants that on a large number of occasions appellants transported silk thread or yarn on bobbins for different silk mills over a route wholly within this Commonwealth and between termini therein, but by way of defense the appellants contended that each such movement was a part of an interstate shipment. Appellants offered evidence tending to show that they contracted with several silk mills to transport raw silk from the seaboard in New York and New Jersey to throwing mills in Pennsylvania where it was processed into yarn and wound on bobbins, an operation which required from four to

seven days; that they were then to move the yarn to a weaving mill in Pennsylvania over an all Pennsylvania route where it was made into cloth, requiring several days more; and that then they were to move the cloth to dye mills in New Jersey. It was shown that the appellants did move large quantities of silk and silk products but did not move all of the yarn or cloth which they had transported from out of the state in the form of raw silk to the throwing mill as, for example, quantities of yarn were transported to mills at Williamsport by other carriers. There were also separate bills of lading for each of the movements and the freight charges were dependent upon the weight and bulk of the different articles. The ownership of the mills in the state of Pennsylvania was in different persons although in some cases they were affiliated concerns. This would seem to indicate that while the appellants in many instances transported silk in different forms from the seaboard through Pennsylvania into New Jersey, yet nevertheless the different movements were by virtue of contracts with different owners. It is clear that the movements from the seaboard to the throwing mill and from the weaving mill to the dye works were interstate commerce. We think it equally clear that the movements between the throwing mill and the weaving mill were intrastate commerce. When the raw silk was delivered at the throwing mill, the interstate movement came to a complete rest and the raw silk was then changed in character and the contracts for shipments were with different owners.

It is not necessary to discuss the many cases decided by the United States Supreme Court bearing on the question of interstate transportation where it has been held that the delivery of a product within the state ceases to become interstate transportation when it has "come to rest" definitely at a given point: Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co., 249 U. S. 134,

39 S. Ct. Rep. 237; Coe v. Errol, 116 U. S. 517, 525, 6 S. Ct. Rep. 475; Bacon v. Illinois, 227 U. S. 504, 515-516, 33 S. Ct. Rep. 299; McCluskey v. Marysville & Northern Ry. Co., 243 U. S. 36, 37 S. Ct. Rep. 374; Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U. S. 257, 48 S. Ct. Rep. 107; Federal Compress Co. v. McLean, 291 U. S. 17, 54 S. Ct. Rep. 267; Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. Rep. 34. Of course, a shipment does not lose its character as interstate commerce where for reasons of necessity or for the purpose of safety and convenience the course of the shipment is interrupted: Coe v. Errol, supra; Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. Rep. 146.

The Arkadelphia case, cited above, is in point. There the movement was of rough lumber from the woods to milling points in the same state. At the milling points the lumber was processed and later shipped by the same carrier to points outside the state and the Supreme Court held that the movement from the woods to the milling point was intrastate commerce. There, as here, the movements of the rough material and processed material by the same carrier were separate movements, one interstate and the other intrastate.

3. The final question has to do with movements during 1934 in both directions between three localities in Pennsylvania, Scranton-Wilkes-Barre district, Allentown-Bethlehem district, and Philadelphia, where the freight was routed partly through New Jersey and the Public Service Commission held that such routing was a mere subterfuge to avoid regulation by this state. The appellants operated bona fide interstate routes for the transportation of freight from New York and northern New Jersey through Hackettstown, New Jersey, across the Delaware River at Easton and thence through Pennsylvania to Philadelphia, from the Scranton-Wilkes-Barre district through Stroudsburg to Hackettstown and beyond, from Allentown and Bethlehem

through Easton to Hackettstown, New Jersey, and made a few movements between Scranton and Binghamton, New York. As appellants were transporting considerable freight over these routes in both directions, this was clearly legitimate interstate commerce and the Public Service Commission of Pennsylvania has not jurisdiction to interfere with these operations. In fact, the commission has recognized this situation and disclaimed any intention of attempting to regulate bona fide interstate commerce. The service of which the commission complains concerns routes having both termini in this Commonwealth, consisting principally of the transportation of freight from the Scranton-Wilkes-Barre district to Stroudsburg, thence across the Delaware River a short distance below that place to Hackettstown, New Jersey, thence through Washington, New Jersey, to Pennsylvania at Easton and south within Pennsylvania to Philadelphia, with an alternate route between Stroudsburg and Easton through Belvidere which was west of and considerably shorter than the route through Hackettstown, and transportation from the Allentown-Bethlehem district through Easton to Hackettstown, New Jersey, thence by the same route back to Easton and thence to Philadelphia, through Pennsylvania. Although the movement of freight from the Scranton-Wilkes-Barre district and from the Allentown-Bethlehem district through Hackettstown, New Jersey, to Philadelphia was not by a normal route and one which would have been followed if the appellants were concerned alone in the transportation between those points, they contend that such movements were so interwoven with the interstate movements that, in the interest of economy and efficient administration, they were justified in so operating. In further support of this position they produced evidence tending to show that they handled some freight within the triangle formed by Belvidere, Hackettstown, and Phillipsburg,

New Jersey, which might furnish a reason for passing through that territory.

"The bona fide transportation of passengers from a point in one state to a point in another state is interstate transportation, and transportation between two points in the same state by a normal route which is partly in another state is still interstate transportation": Nevin Bus Lines v. P. S. C., 120 Pa. Superior Ct. 266, 182 A. 80. We will refer to the evidence upon which the commission relies to support its finding that many of the movements of freight by the appellants between termini in this state were, in fact, intrastate commerce and that the departure of the routes from this state was a mere subterfuge to avoid regulation.

Members of the Blackmore family have been engaged in freight transportation in the localities in question for a number of years, Arnold M. Blackmore under the registered fictitious name of A. Blackmore Transportation Company, and Albert H. Blackmore as the A. Blackmore Transfer Company. In the early part of 1934, Albert H., Walter D., and Annie Blackmore organized a Pennsylvania corporation, A. Blackmore Transfer Company, Inc., and Arnold M. Blackmore became general manager, solicitor, and representative of the corporation. Albert H. and Walter D. also became associated with the corporation. The three men were brothers, sons of Annie Blackmore. The records of the commission offered in evidence disclose that Arnold M. Blackmore has been a persistent violator of the Public Service Company Law. In 1930 he was granted a certificate of public convenience and the commission found that he had operated without authority and imposed a fine of five hundred dollars upon him. On March 7, 1932, the commission found that he had engaged in intrastate transportation in violation of his certificate and issued a cease and desist order against him. On March 13, 1934, after the expiration of his

certificate, he was found to have again violated the law and a cease and desist order was again issued. About this time the trucks and some of the property which had been employed by the brothers theretofore in motor freight transportation were transferred to the corporation and the corporation took over the active operations. Prior to the cease and desist order of March 13, 1934, the Blackmores had operated their freight fleet from the Scranton-Wilkes-Barre district by what is known as the Wind Gap Road, an all Pennsylvania route, to Easton, and they had operated directly from Allentown and Bethlehem to Philadelphia. After the cease and desist order was issued substantially the same volume of business was carried between the same termini but routed through Hackettstown, New Jersey, and thence back through Easton, Pennsylvania, to Philadelphia, a course at least twenty-two miles longer than the all Pennsylvania route. While there was some evidence that the road through Hackettstown was in the winter season somewhat easier to operate than the all Pennsylvania route, this occurred only on rare occasions and certainly did not justify the twenty-two miles additional travel. It was also significant that the shorter route was followed until the cease and desist order was effective. A pertinent fact developed when it was shown that freight from Allentown and Bethlehem which would naturally have gone over an improved road directly to Philadelphia was thereafter routed through Easton to Hackettstown, New Jersey, and then back by the same route to Easton and thence to Philadelphia. It would be a considerable strain on our credulity to accept the suggestion that such a movement was in the interest of economy of operation.

While it is most evident that the normal route from the Scranton and Allentown districts to Philadelphia was by an all Pennsylvania route, the appellants offered some testimony with relation to freight that was picked

up within the state of New Jersey on the route between Stroudsburg and Easton. They depended largely upon the testimony of Arnold M. Blackmore and his drivers to support their position, but the effect of such evidence was diminished by cross-examination and the production of other testimony. While the hearings were being conducted, the commission and the intervenor caused a check to be made of this business that was picked up at intermediate points and discovered that for three days while they were making the checks, the appellants did not have a single pickup or delivery in the state of New Jersey. In fact, the driver who had testified to such pickups was compelled to admit that he was mistaken in part in his testimony. Certainly the movement from Allentown through Easton to Hackettstown, New Jersey, and thence back to Easton before proceeding to Philadelphia was a poorly veiled attempt to affect the appearance of engaging in interstate transportation. It also appeared that frequently trucks so loaded that there was not room for additional freight that would have justified a movement to Hackettstown, New Jersey, were nevertheless taken over this longer route. Having in mind the Allentown movements, we feel that the commission was fully justified in concluding that in a large number of cases the movements from Scranton to Hackettstown, New Jersey, were also a mere subterfuge intended to avoid regulation by the commission.

The terminal facilities at Hackettstown were not such as to indicate that this was a natural junction point. At that place the appellants secured the use of a small garage located on the property of a filling station operator. They did not have anyone in charge of the terminal nor have a telephone in their own name but depended upon the service of the owner of the filling station. In return for the use of the garage and the answering of his telephone the appellants purchased gasoline from him.

"Interstate commerce, in order to be entitled to the protection of the federal Constitution, must be real and bona fide. The question whether it is so is open to inquiry ...... But the commerce thus protected is real commerce. It has never been held, and we believe never intended, that a mere fiction of interstate commerce may be so availed of as to deprive a state of its power to enforce sound regulation of the use of its highways in intrastate commerce": Inter-City Coach Co. v. Atwood, 21 Fed. (2d) 83, 85. (Appeal refused by Supreme Court, 278 U. S. 663.) As we have indicated, the question of subterfuge is one of fact to be determined by the commission, and we are all of the opinion that the evidence offered was sufficient to sustain such a finding.

The cumulative effect of the evidence produced against the respondents was persuasive. Starting with the history of the company and its officers and the thinly disguised and apparent attempt to avoid intrastate regulation by routing freight from Allentown to Hackettstown and thence back by the same route to Easton before proceeding to Philadelphia, and taking into account the fact that coincident with the cease and desist order of March, 1934, freight between Scranton and Philadelphia was immediately detoured through New Jersey, we have also the fact found by the commission and supported by the evidence that the normal and reasonable junction point was Easton and not Hackettstown. These facts, with others recited, convince us that the evidence was ample to support the finding of the commission.

While freedom of commercial intercourse between the states is of such importance that the Congress is given power to regulate it and the states cannot be permitted to interfere with it, these false movements are not interstate commerce. The mere touching of the soil of another state not made in the ordinary course of busi-

ness and in the orderly and economical transaction of commerce did not constitute, as we see it, an interference with interstate commerce. In the Nevin Bus Lines case, cited above, we endeavored to point out the fact that the state may not interfere with the ordinary and bona fide transaction of interstate commerce and, in so doing, what would ordinarily be intrastate transportation may become interstate transportation by reason of the interlocking of routes. The difficulty with the appellants' position is that clearly there was no justification for the movement of the freight from Allentown to Hackettstown and then retracing the route within the state of New Jersey to Easton before proceeding to Philadelphia and, to a lesser degree, for the movement of freight from Scranton to Philadelphia. If, as in the Nevin Bus Lines case, Hackettstown had been a normal junction point for the transfer of freight and the interlocking of routes, the situation would have been different.

Appellants furnished evidence showing that in many instances they stamped shipments of the character we are now considering, "via Hackettstown." This was not of itself sufficient. "It is 'not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to state control, into an interstate commerce business, protected by the commerce clause'; ...... at least when the contract achieves nothing else. The importance of the commerce clause to the Union of course is very great. But it also is important to prevent that clause being used to deprive the States of their lifeblood by a strained interpretation of facts": Superior Oil Co. v. Mississippi, 280 U. S. 390, 395, 50 S. Ct. Rep. 169.

Many of the questions presented on this record may not reappear since Congress has undertaken to regulate interstate transportation by motor vehicles and the Act of Congress has provided for meeting just such diffi-

culties as are here presented. The offenses complained of all occurred before the passage of that act and the intention of the appellants must be examined in the light of the law as it was at the time.

The order of the commission is affirmed at the cost of the appellants.