Ryan et al., Appellant, *v.* Pennsylvania Public Utility Commission.

518

Argued November 20, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Richard V. Zug,* of *Shertz & Zug,* for appellant.

*Solomon Freedman,* with him *Harry M. Showalter,* for appellee.

OPINION BY BALDRIGE, J., January 30, 1941:

This appeal is from an order of the Pennsylvania Public Utility Commission in a proceeding instituted upon its own motion. The Commission found that the appellant, the Keystone Transfer Company, a common carrier, in routing and transporting certain freight originating in Pittsburgh and destined for Washington and Uniontown, Pennsylvania via Wheeling, West Virginia, was not engaged in bona fide interstate transportation, but took such indirect route as a mere subterfuge for the purpose of avoiding its jurisdiction. A cease and desist order was accordingly issued as to such transportation not covered by the appellant's certificates and a fine of $1500 was imposed by way of a penalty.

The appellant, preliminary to its main argument on the substantive questions raised, challenges the adequacy of the formal complaint made, asserting that it fails to set forth specifically the nature of the violations of law charged.

Section 1001, Article X, of the Act of May 28, 1937, P. L. 1053, 66 PS §1391 provides, inter alia, as follows: "The commission ...... may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the commission has jurisdiction to administer, or of any regulation or order of the commission ......"

We had occasion to consider that section in *Armour Transportation Company v. Pennsylvania Public Utility Commission,* 138 Pa. Superior Ct. 243, 10 A. 2d 86. There, as here, the Commission upon its own motion filed a complaint "for the purpose of determining

whether Armour Transportation Company has violated the provisions of the Public Utility Law and has thereby incurred penalties and forfeitures provided by law." We held that the appellant had a right to be apprised of the nature of the charges asserted by the filing of a proper written complaint setting forth with reasonable particularity the alleged violations of the utility laws.

The complaint before us is somewhat more specific as, in addition to alleging a violation of the Public Utility Law generally, it set forth that the appellant has been operating as a common carrier "in violation of the conditions and restrictions contained in the certificate of public convenience ......"

The counsel for the Armour Transportation Company attended two hearings before the Commission but refused to present testimony and at the very inception as well as all through the proceeding contended that the complaint was indefinite and insufficient. The Commission there revoked the carrier's operating privileges specifying in its order five distinct violations including failure to carry proper insurance, to notify the Commission of all accidents, to obtain proper equipment certificates before operating its vehicles over the state highways, and offenses of a similar character.

Here, at the first hearing on May 18, 1939, the attorney for the appellant stated he had not filed an answer but "would reserve the right to answer after hearing the testimony of the Public Utility Commission, to answer either formally or through the production of witnesses at a later hearing."

Five separate hearings were held and at none of them, except the last, did counsel for appellant raise any question as to the sufficiency of the complaint or as to lack of knowledge of the charge. The nature of the evidence presented by the Commission, the cross-examination of its witnesses, and the appellant's own evidence, including certain correspondence between its counsel and the

Commission, all show that the appellant knew that the complaint was based on an alleged subterfuge in transporting goods by routing trucks containing freight originating in Pittsburgh and destined for parts in southwestern Pennsylvania by crossing the state line.

In view of the entire course and nature of the investigation and the attending circumstances, we are convinced that the appellant was not deprived of any fundamental right. We stated in *Armour Transportation Company v. Pennsylvania Public Utility Commission,* supra, p. 250: "The question of what is proper notice, or, as here, of what constitutes a specific designation of the issue raised or charges made, depends necessarily upon the facts of each case, the type of investigation being conducted, the violations alleged, and the penalty or order sought to be imposed."

The Commission in this case imposed a fine and entered a cease and desist order as to operations not properly certificated, but it did not revoke the carrier's certificate on the ground of various and specific violations of law. We do not sustain the appellant's contention but would suggest to the Commission that in each complaint it should set forth the charges as definitely as may be reasonably done. It is due to the Commission to state that the complaint was filed before our opinion in the Armour Transportation Company case was handed down. No doubt this trouble will be avoided in the future.

We come now to consider the question whether the evidence was sufficient to support the order. A review of the essential facts is, therefore, necessary. In 1920 the appellant partnership was formed with its principal office in Uniontown. Very shortly thereafter it began as a common carrier to transport goods by motor vehicles and to distribute in and around Uniontown meat products shipped in carload lots by the Allied Packers, Inc., from Wheeling, West Virginia. In 1934 the Hy-

Grade Food Products Company, successor to Allied Packers, Inc., disposed of their fifteen trucks in which they carried their products to points in West Virginia, Pittsburgh, and Ohio. The appellant company thereupon established a terminal at Wheeling, West Virginia and in addition to the business it had been doing in the Uniontown area, took over the entire distribution of the goods of the Hy-Grade Food Products Company.

Between 1933 and 1939 the appellant company applied for and was granted certain permits by the Pennsylvania Public Utility Commission. They included the right to haul goods within 12 miles of Uniontown, Pennsylvania, and household and office furnishings from the Uniontown area to other points, and vice versa; to transport "as a class D carrier from warehouses and freight stations in the City of Uniontown, to and between stores of the Union Supply Company in the counties of Westmoreland and Fayette and the return of property from the said stores to the said warehouses"; to deliver meats, butter, and eggs, received by rail in Pittsburgh to points in the counties of Allegheny, Lawrence, Beaver, Washington, Westmoreland and Cambria; and finally it was certificated to transport property from the Department of Public Assistance as a class D carrier, from their warehouse in the city of Uniontown to points in certain nearby and adjoining counties, including Allegheny and Washington.

On September 5, 1939, the Interstate Commerce Commission, under the provisions of the "grandfather" clause of the Federal Motor Carrier Act, 1935 (49 U. S. C. A. 306a) issued to the appellant a provisional certificate permitting it to operate as a common carrier by motor vehicle in interstate or foreign commerce over certain designated routes between Wheeling, West Virginia and Pittsburgh, Pennsylvania; between certain points in Pennsylvania, including from Pittsburgh over U. S. highway Route 19 to Washington, and to

transport packing house products between specific points in West Virginia and Ohio.

It is not disputed that all of appellant's freight, both interstate and intrastate (except those commodities for which it had an intrastate permit and certain property moving in interstate commerce), originating in Pittsburgh and destined for Uniontown or Washington, Pennsylvania, was shipped by trucks to appellant's distributing platform at Wheeling, West Virginia, where it was unloaded and assorted; that freight shipped from West Virginia and Ohio, as well as that originating and for delivery in Pennsylvania, was loaded in another truck and delivered to either Washington or Uniontown. In traveling from Pittsburgh to Wheeling the appellant's drivers used their discretion between two alternate routes. One goes west on Route 22 approximately 34 miles to Weirton, West Virginia, thence south on Route 2, 26 miles to Wheeling, a total of 60 miles. The other goes south on Route 19 about 29 miles to Washington, Pennsylvania, thence southwest on Route 40, 30 miles to Wheeling, a total of 59 miles.

In transporting goods from Pittsburgh to Washington, Pennsylvania, via Wheeling, the appellant traveled 89 or 90 miles depending upon which of the two routes was traversed while the direct way and wholly within Pennsylvania, on Route 19, is a distance of only 29 miles. Furthermore, the appellant's truck in making deliveries to Washington of freight not within one of its certificates would go to Washington, continue 30 miles beyond to Wheeling where the goods were put into another truck and then carried back to Washington. The same plan was followed in making deliveries from Pittsburgh to Uniontown, which is south and slightly east of Pittsburgh. By the direct, intrastate Route 51, it is only 52 miles distant. In transporting goods via Wheeling the appellant's trucks

524

traveled either 127 or 128 miles to get to Uniontown, more than twice as far as the intrastate route.

It is quite apparent that the appellant's transportation of what in fact was intrastate freight was routed through Wheeling, thus involving an out-of-the-state, roundabout and apparently useless and expensive transportation. It attempted to justify the routing of intrastate shipments via Wheeling on the basis of economy of operation and the necessity of handling all goods through the Wheeling terminal. It did not, however, introduce any substantial evidence bearing on that question. The only testimony in support thereof is the bald assertion of appellant's traffic manager at Wheeling that such a course was necessary. No figures or facts were produced so that a comparison of the costs could be made between the direct, intrastate and the indirect, interstate routes.

In addition to this uncontradicted evidence as to the relative distances of the interstate and intrastate routes there are certain cumulative facts appearing in the record that are very persuasive and give strong support to the Commission's findings that the appellant resorted to a subterfuge. For example, the rates charged by the appellant for shipments from Pittsburgh to other Pennsylvania points via Wheeling are lower than the corresponding rates charged by their competitors holding intrastate certificates, who travel the direct route. That factor, although not conclusive, may be properly considered in passing upon the question whether appellant, in crossing the state line, was doing so in good faith or for the purpose of attempting to avoid regulations by the State Commission: *Eicholtz v. P. S. C.*, (Mo.) 306 U. S. 268, 271, 272.

It appears also that the appellant's own rates from Pittsburgh to Washington and Uniontown via Wheeling are lower than its rates from Pittsburgh directly to Wheeling. For instance, the first class rate from Pitts-

burgh to Wheeling is 51 cents for an approximate 59 mile haul. The rate from Wheeling to Washington is 43 cents for a 30 mile haul, while the rate from Pittsburgh via Wheeling to Washington is only 35 cents for an 89 mile haul. It will thus be observed that the appellant bases its rates on *highway mileage actually traveled* when transporting goods from Pennsylvania to points in West Virginia, but upon a *direct highway mileage* when transporting between points in Pennsylvania by the roundabout route.

It is also significant in those instances in which the appellant held a certificate from the Pennsylvania Commission, as in the transportation of meat products, household goods, etc. from Pittsburgh, and goods generally in interstate commerce under the provisional order of the Interstate Commerce Commission, it used the direct route to Washington instead of going to Wheeling and then back to Washington as in other instances. In other words it used the shorter and direct intrastate route when it was properly authorized so to do and on other occasions the longer and indirect route. That practice casts a suspicion upon its motives in making the Pennsylvania shipments via Wheeling.

Whether such transportation is bona fide interstate commerce or a subterfuge is primarily an administrative question involving facts to be determined by the Commission. If, as here, there is sufficient evidence to support its findings we do not interfere therewith. It is not our duty to exercise our independent judgment as no question of confiscation is involved: *Solar Electric Company v. Pennsylvania Public Utility Commission et al.*, 137 Pa. Superior Ct. 325, 354, 9 A. 2d 447. We are limited in determining whether there is any error of law or lack of evidence to support the order of the Commission or violation of any constitutional right: Public Utility Law, §1107, Article XI, P. L. 1053, 66 PS §1437; *Nevin Bus Lines, Inc. et al. v. Public*

*Service Commission et al.,* 120 Pa., Superior Ct. 266, 269, 182 A. 80; *Blackmore et al. v. Public Service Commission et al.,* 120 Pa. Superior Ct. 437, 448, 183 A. 115.

Appellant contends also that the transportation complained of comes under the jurisdiction of the Interstate Commerce Commission, and that the Pennsylvania Commission's order imposes an unreasonable burden on interstate commerce in violation of the Commerce Clause of the United States Constitution. The provisional order of the Interstate Commerce Commission authorizing interstate commerce between certain fixed termini certainly cannot be construed as granting authority to appellant to engage in the kind of transportation here questioned nor does it interfere with the Pennsylvania Commission's jurisdiction.

The Federal Motor Carrier Act of August 9, 1935, (49 U. S. C. A. §302c) expressly recognized the right of the several states to regulate intrastate carriage., The Supreme Court of the United States in the Eicholtz case, supra, which involved a situation substantially analogous to the present case, very definitely stated that a state Commission has jurisdiction to determine the question whether carrying merchandise across state lines is bona fide or a mere subterfuge to evade the state Commission's jurisdiction. It ruled, p. 273, that mere pendency before the Interstate Commerce Commission of an application by a motor carrier to operate under the Federal Motor Carrier Act in interstate commerce did not supersede the authority of the state body to take appropriate action under the state law to enforce reasonable regulations of traffic on the state highways. Mr. Chief Justice HUGHES said p. 274: "If appellant's hauling of the merchandise in question across the state line was not in good faith but was a mere subterfuge to evade the State's requirement as to intrastate commerce, there is no ground for saying that the prohibi-

tion of the use of the interstate permit to cover such transactions, ...... was an unwarrantable intrusion into the federal field or the subjection of interstate commerce to any unlawful restraint."

The appellant cites *Interstate Busses Corporation v. Holyoke Street Railway Company et al.*, 273 U. S. 45, in support of its contention that the burden was on the Commission to prove that the interstate and intrastate business is capable of separation. In that case the Interstate Bus Company was attacking a Massachusetts statute requiring it to obtain a license before operating in competition with street railways in Massachusetts. The bus company operated between Hartford, Connecticut and Greenfield, Massachusetts, stopping to take on intrastate passengers in Massachusetts. The Supreme Court of the United States, in upholding the refusal of an injunction against the enforcement of the state act, said p. 51.: "The burden is upon appellant to show that enforcement of the Act operates to prejudice interstate carriage of passengers ...... The record contains no information as to the number of persons, if any, traveling in interstate commerce on appellant's buses over the part of the route competing with the street railway. It is not shown that the two classes of business are so commingled that the separation of one from the other is not reasonably practicable or that appellant's interstate passengers may not be carried efficiently and economically in buses used exclusively for that purpose or that appellant's interstate business is dependent in any degree upon the local business in question. Appellant may not evade the Act by the mere linking of its intrastate transportation to its interstate or by the unnecessary transportation of both classes by means of the same instrumentalities and employees."

That case is adverse rather than helpful to appellant. Nor does *Railway Express Agency, Inc., v. Pennsylvania*

528

*Public Utility Commission*, 134 Pa. Superior Ct. 405, 4 A. 2d 176, throw any light upon the question now before us. The burden imposed on appellant was not successfully carried.

A careful review of this record and the argument of appellant's able counsel fail to disclose any just reason for interference with the Commission's order.

The order of the Commission is affirmed.