York Telephone & Telegraph Company, Appellant, *v.* Pennsylvania Public Utility Commission.

12

Argued November 21, 1955.   Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

14

*John C. Kelley,* with him *William S. Eisenhart, Jr., Arthur H. Hull* and *Hull, Leiby & Metzger,* for appellant.

*John E. Fullerton,* Assistant Counsel, with him *Edward Munce,* Assistant Counsel, and *Thomas M. Kerrigan,* Acting Counsel, for Public Utility Commission, appellee.

*David Dunlap,* for Pennsylvania Independent Telephone Association, under Rule 46.

OPINION BY HIRT, J., March 26, 1956:

York Telephone & Telegraph Company, an independent telephone company incorporated in 1907, renders service through 13 exchanges for the most part in York County but to some extent also in Adams County in this State. The service or franchise area, of the Company as we shall refer to it, comprises 687 square miles with a population of upwards of 167,000. Impelled by numerous complaints lodged with it, the Public Utility Commission on October 30, 1950, instituted an investigation and inquiry, of its own motion,

to determine whether the Company was providing adequate, efficient and reasonable service and facilities in compliance with the mandate of §401, art. IV, of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1171.[1]  Numerous hearings were held and the testimony of 61 witnesses disclosed a widespread dissatisfaction with the inadequate telephone service provided by the Company; the evidence indicated a large accumulation of unsatisfied service demands.  The record of the investigation was closed on November 20, 1951. In its order of October 6, 1952, the Commission, in commenting on the testimony, stated: "The record shows that, during the period January 1, 1946 to August 31, 1951, respondent received a total of 19,529 applications for service and during the same period its installation and cancellations totaled 15,161 or about 78 per cent of the applications received.  There were 13,694 new customers served during this period and the net gain in telephones amounted to 10,748."  A statement submitted by the Company at the request of the Commission disclosed that as of January 1, 1951, the Company had a backlog of 4,128 unfilled applications for telephone service.  In the 1952 order the Commission found: "1. Following World War II and continuing to the present time, there has been a large demand for more and better telephone service in the area

---

[1] Section 401 provides: "Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employes, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. *Such service and facilities shall be in conformity with the regulations and orders of the commission* . . ." (Italics supplied)

served by respondent. 2. Six years after the end of those hostilities respondent is yet struggling to consume its back-log of service requests. 3. Respondent has plans, largely in process of execution to alleviate its service difficulties. 4. This construction program was unduly late in getting under way. 5. Respondent failed to solve the construction manpower problem." Based on these findings, and the supporting testimony, the Commission, in respects material to this appeal, ordered and directed: "2. That . . . *respondent, shall, within 30 days of service of this order, augment its cable and installation craftsmen in accordance with the recommendation of its consulting engineer.* (All emphasis throughout this opinion will be ours). 3. That . . . respondent, shall, within 30 days of service of this order, submit to this Commission a comprehensive statement of the results of its construction and improvement program to date that has or will, *in the near future,* eliminate the inadequate, inefficient and unreasonable service found to have existed at the time this investigation was instituted. 4. That, following the submission of the report required by (3) above, York Telephone and Telegraph Company, respondent, shall submit monthly reports to this Commission, showing such progress as may have been made in the construction and improvement program during the next preceding month. 5. That, upon completion of the construction and improvement program, . . . respondent shall submit to the Commission a final report, indicated as such."

In the absence of an appeal we may take it that the Company concedes the validity of the above findings in the order of October 6, 1952. Cf. §1112 of the Public Utility Law, 66 PS §1442. In partial compliance with the 1952 order the Company thereafter submitted monthly progress reports, as directed, but did not file

a final report, for the obvious reason that deficiencies in the service have never been corrected. From an analysis of the successive monthly reports, the Commission was not satisfied with the Company's performance of its construction program. Accordingly, on February 14, 1955 the Commission entered a rule on the Company to show cause "why its authority to serve in York and Adams Counties should not be amended, modified, revised, *or other penalties imposed,* . . . for failure to comply with the order of the Commission dated October 6, 1952, . . . and for failure to render reasonable and adequate service in violation . . . of the Public Utility Law." With the rule, as served, the Commission gave the Company notice of its reasons for reviving the investigation in this language: "An analysis of respondent's January 1, 1955, progress report shows the following: 1. The net station gain for 1954 was 30% less than for 1953; 2. The net station gain for 1954 was the lowest for the last three years; 3. The number of deferred applications was considerably higher at the end of 1954 than at the beginning of 1954; 4. The number of deferred applications as of January 1, 1955 was almost as high as of January 1, 1951, viz., 3,750 v. 4,128. Furthermore, the number of informal complaints is abnormally high, and formal proceedings continue to allege inadequate service." The Company filed an answer to the rule, averring in detail the progress made by it in enlarging its telephone system "toward the goal of providing service to all applicants." Many hearings were held on the rule at which, under §420 of the Public Utility Law, 66 PS §1190, "the burden of proof to show that the service and facilities involved are adequate, efficient, safe, and reasonable . . ." was upon the Company. Based upon specific findings from the voluminous testimony developed at the hearings on the rule, the Commission

in its order of August 8, 1955, stated: "In the prior proceedings in this investigation, respondent promised much for the future. The testimony . . . indicates how inadequate its performance has been, notwithstanding the time and opportunity that were granted respondent by the Commission to correct the inadequacies found to have existed in our 1952 order . . . The record is replete with evidence that respondent has been disdainful and contemptuous of the public, . . . and has deliberately chosen to refrain from expenditures *for manpower* which would have provided timely service, contrary to the express mandate of the Commission's order of 1952."

Upon the initiation of the proceeding of October 30, 1950, the Company engaged the services of the engineering firm of Day and Zimmermann. The engineers made a comprehensive survey of the facilities of the Company; thorough studies were also made of the probable future service demands and the reasons for the existing numbers of unfilled applications. The survey culminated in a detailed report proposing a comprehensive program designed to meet the Company's existing and anticipated service requirements. The evidence in all of the hearings before the Commission emphasized the importance of *manpower* and particularly the necessity for additional *"cable crews"* to fill the existing deferred applications for service and to meet current and future demands. At the time of the 1950 investigation the Company had but five cable crews. The report of the engineers, as submitted, was later amended by Theodore E. Seelye, vice president of Day and Zimmermann, to contain the recommendation that three additional cable crews be employed increasing the total number of such crews to eight. The order of October 6, 1952, recited: "The record in this case is replete with disclosures . . . of *insufficient construction*

*personnel . . ."* and further: "Time after time respondent was questioned about various planned construction jobs and with monotonous regularity we were told that these *jobs were held up by the shortage of cable splicers."* On the authority of §413[2] of the Public Utility Law, 66 PS §1183, the Commission in the above order directed the Company to augment its cable and installation forces (cable splicers are essential members of cable crews), in accordance with the recommendation of Day and Zimmermann, its engineers, that three additional cable crews be employed. In the present order of August 8, 1955, the Commission found (Finding II) "that respondent did not comply with the requirement of our October 6, 1952 order respecting the employment of additional cable crews within 30 days but, on the contrary, in violation of Section 907 of the Public Utility Law, failed to comply with it for nearly two years, during which interval deferred applications continued to accumulate." The Company did not add a sixth cable crew until January 1, 1953. The seventh was not added before July 1, 1954 and the eighth cable crew not before September 1, 1954. The Commission in Finding V stated: "Consequently, we find respondent violated the cable crew requirement of our order from November 14, 1952 through August 31, 1954 for

---

[2] Section 413 provides: "Whenever the commission, after reasonable notice and hearing, upon its own motion or upon complaint, finds that the service or facilities of any public utility are unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, or otherwise in violation of this act, the commission shall determine and prescribe, by regulation or order, the reasonable, safe, adequate, sufficient, service or facilities to be observed, furnished, enforced, or employed, including all such repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public, and shall fix the same by its order or regulation."

655 days . . ." Section 1301 of the Code, 66 PS §1491 provides: "(a) If any public utility shall . . . fail, omit, neglect, or refuse to perform any duty enjoined upon it by this act; or shall fail, omit, neglect or refuse to obey, observe, and comply with any regulation or final direction, requirement, determination or order made by the commission, . . . such public utility, for such violation, omission, failure, neglect, or refusal, shall forfeit and pay to the Commonwealth of Pennsylvania the sum of fifty dollars . . ." And §1301(b) provides: "Each and every day's continuance in the violation of any regulation or final direction, requirement, determination, or order of the commission . . . shall be a separate and distinct offense . . ." On the authority of §1301 the Commission imposed a penalty of $50 for each of 655 days of the Company's default or a total fine of $32,750 to be paid by the Company to the Commonwealth for its failure to comply with the direction of the Commission as to additional cable crews in the 1952 order.

The Company did not assign findings II and V as error in this appeal. In effect the Company concedes that it failed to comply with the order of October 6, 1952, and the controlling question raised by this appellant on this phase of the appeal, therefore, is whether the imposition of the above penalty under §1301 of the Public Utility Law is justified under the findings in the 1955 revived investigation.

The Commission in the 1952 order, referring to the report and the recommendations of Day and Zimmermann made to the Company, stated: "In general these plans appear comprehensive and, if *promptly executed*, should give to respondent's present and prospective patrons the service to which they are entitled." The difficulty is that in material respects the recommendations of the engineers were still unexecuted more than

three and one-half years later. The rule served on the Company which revived the investigation in 1955 was addressed to the acute problem raised by the unfulfilled demands upon the Company for reasonable service. The seriousness of the Company's derelictions in the aggregate is indicated by the testimony that, between January 1, 1954 and March 1, 1955, as many as 160 informal complaints against the Company were filed with the Commission. During the same period only 157 complaints were directed against The Bell Telephone Company of Pennsylvania which had 3,239,-851 stations as compared with but 48,491 stations in the York Telephone and Telegraph Company's system. Not all of these complaints were based upon unfilled applications for telephone service, although the Company's reports disclosed a total of 3,568 deferred applications as of March 1, 1955 including 22 individuals who had applied for telephones during the years 1946 through 1950 and who were still without service. The record before us indicates that lack of adequate construction manpower was responsible for the backlog of unfilled applications for service. J. C. Herbert, an administrative officer of the Company was in charge of applications for service. As a Company's witness he stated: "Well, manpower, of course, creates facilities." Under "Conclusions and Recommendations" the report of Day and Zimmermann had warned the Company: "Concentrated effort and complete cooperation of all departments and personnel concerned are absolutely essential, and must be directed toward the clearance of requests pre-dating January 1, 1951. As subscribers on the waiting list are connected, unexpressed demands for service will undoubtedly appear in increasing numbers. In many instances these subscribers can be connected as facilities are made available for deferred applicants. *Care must be exercised, however, to see that*

*these connections do not interfere with the schedules
for connecting deferred applications,* and all possible
effort must be made to carry out the obligation of the
Company to give adequate service to all its subscribers
in the area served." And at the hearing on April 6,
1955, when asked: "Mr. Herbert, as an overall proposi-
tion now, with respect to the deferred applications pre-
dating 1951, is it not a matter of fact that if the com-
pany would have had more manpower, all of these ap-
plications would have been filled before this date?" he
replied: "Before this particular date, we could say yes.
How much before, I wouldn't want to predict without
a study because sometimes central office conditions did
delay the installations." The deficiencies in "man-
power" to which the witness Herbert referred, were
principally shortages in cable crews including cable
splicers. And when asked for the reason that a large
number of specific applications for service were de-
ferred, he stated: "Because the *cable crews* have been
otherwise engaged and could not be assigned to go
through with this entire project." Elsewhere he had
stated: ". . . it was a matter of assigning manpower to
areas where there were more people to be served." The
testimony demonstrates that the available cable crews
were assigned to supply current and more profitable
service at the expense of "the clearance of requests pre-
dating January 1, 1951."

Of 22 persons who had applied for service during
the years 1946-1950 whose applications concededly had
not been filled by February 1, 1955; nine of them, on
a State highway, were denied service until 1954 when
the Company finally became reconciled to the only ef-
fective plan of building "a lead-covered aerial cable
along that highway." Installing the cable and making
the necessary connections involved the work of cable
crews and cable splicers. Of three of the 22 applica-

tions made in 1950 no explanation was forthcoming for the deferment of two of them, and as to the third the witness Herbert testified that the difficulty was one of manpower and that if the Company had *"more installers or more splicers"* the application could have been filled. As to two 1949 applications there was no explanation of the failure to supply service prior to February 1955. So also no reason was given for the failure to supply the remaining 8 of the 22 applicants. It was in concluding his comments on the above group of applicants that Mr. Herbert made the admission that "as an overall proposition . . . if the Company would have had more manpower all of these applications would have been filled before this date." Since the Company did not meet the burden of justifying its failure to supply service to any of the 22 applicants, it was a fair inference for the Commission that lack of a sufficient number of cable crews with cable splicers was responsible to some extent for the failure in each instance.

Of additional unsatisfied applicants, who had filed complaints against the Company, 30 appeared as witnesses before the Commission. The order of August 8, 1955 contains a summary of the testimony of some of them, quoted in the margin, which the Commission regarded as typical.[3]

---

[3] "Rev. Felix R. Kelaher, Treasurer of St. Francis Preparatory School for boys, Spring Grove, testified . . . that his school had applied for a pay station in 1946, and still did not have it. He said his school has more than 100 boys of high school age from several states and from South America who have need to communicate with their parents, and who have been able to do so only by using the phone in the headmaster's office . . . He said respondent never gave any satisfactory reason why the pay station could not be installed, and never communicated with the school concerning the application, except in reply to the School's inquiries." In response to this testimony John C. Herbert stated: "We have now checked

The appellant gave no satisfactory explanation as to why long standing applications which on March 1,

the facility situation and we can and will furnish those people their pay station service within the month."

"Mrs. Robert Mummert testified . . . that she applied for a phone for their house in Hellam in 1950, but was told 'that the line was full and they just couldn't take care of us.'" She was denied service although her need was acute because of her chronic illness and the disability of her husband.

"Mr. David Sternbergh testified . . . that he operates a skating rink year-round and a swimming pool three months a year on the Lincoln Highway outside of York. He said he had applied for a pay station at his skating rink when it was opened, *thirteen and one-half years previously,* and for a pay station at his swimming pool when it was opened, *seven years previously,* but had been unable to get either . . . He said that new telephone cables along the Lincoln Highway, when completed, were devoted to serving new factories of Caterpillar Tractor Company and other companies . . . Mr. Sternbergh described a telephone conversation he had with respondent's President, Mr. Rudy, as follows: I was expressing a spirit of resentment that I have been a user of the phone company and have been a customer and have been asking for a pay station for some thirteen years when this conversation took place over the phone, and that it was too bad that the telephone company had devoted all of their trunk lines to this new business. And then we old fellows are sitting around still waiting, are still being neglected. And Mr. Rudy said, 'Yes, I guess that's about it, and he hung up.'"

"Rev. Warner W. Helder testified on April 5, 1955 that a year previously the vice-president of the board of his church applied for a phone for the parsonage. Mr. Helder said that when he went himself to the company to see when we could get it he was told the only way I would get a phone is if someone would drop out or if they would put a new line down there because the existing line had already been saturated. He described how difficult it was for a clergyman to be without a telephone, and told of the death in hospital of one of his parishioners before a neighbor could relay a message to bring him to the deathbed." Mr. Herbert in reply admitted that "the only thing that had been delaying service to people in the particular area where Rev. Helder is, has been the labor problem."

"William Miller testified . . . that he had applied for service in 1945, and that in June, 1954, he was informed that the company

1955 totaled 451, had not been filled.  In the present order the Commission stated: "In the prior proceedings

had destroyed his application, whereupon he reapplied. He said that he had again inquired at the company three weeks previously but was not told when he might expect service."

"John H. Brunner testified . . . that he had applied for service in 1952 for his house in York Haven Borough. He stated that he needed a phone for his sales work with Crucible Steel Products Company: '. . . If I want to make a telephone call, I've got to go either to Harrisburg or York, or else use somebody's private phone in their residence or place of business. My business happens to be rather competitive and my competitors are very tickled when they find out something that I am doing wrong. It makes it pretty expensive to go back and forth or to drive 20 miles to make a telephone call.' " The Company was servicing others within 1,100 feet of Brunner's home.

"Lincoln W. Cross, testifying on April 5, 1955, stated that he had applied for service in December 1953, and that the company had never told him when he might expect to receive it."

"Robert Gates Dawes, President of York Junior College, which has an enrollment of 186 students, testified on April 5, 1955 that applications for a pay station for the College had been made in 1946, 1947 and 1952; that in 1952 he had been assured the pay station would be provided 'as soon as possible'; but that he had never been given any indication as to when it would actually be provided. The next day, April 6, 1955, Mr. Herbert stated that the pay station would be installed within 30 days."

"John Eck testified . . . that he had applied for service in the autumn of 1951; that he complained to this Commission in the summer of 1954; that in January 1955 two men from the company stopped at his house and told his wife the phone would be installed within 10 days; that this was the only communication he had ever had from the company; and that he still had no phone. On April 6, 1955, Mr. Herbert said the company's records showed Mr. Eck applied in January 1952 and that all that was required to provide service was 'additional open-wire facilities on present pole lines.' "

"Samuel A. Bare testified . . . that he had applied for service on February 19, 1951; that he had complained to this Commission; that in September 1954 this Commission relayed to Mr. Bare a statement from respondent that 'several miles of line construction is needed before his service can be provided.' and that the company expected 'the delay to extend several more months.' Mr. Herbert

in this investigation, respondent promised much for the future. The testimony discussed above indicates how

testified . . . that service would be provided by October 1, 1955, and on cross examination admitted that the delay was occasioned by lack of manpower: '. . . It was a matter of assigning manpower to areas where there were more people to be served.' "

"William R. Warfel testified . . . that he had applied for a phone in 1949; that he needs a phone for his business, and has been depending on the kindness of a neighbor who has a phone to make and receive calls; that in August 1954 the company told him he would have service 'within weeks,' but 'we are still waiting.' "

"Max Anstine testified on April 6, 1955 that he had applied for service four years previously for his farm, but had not yet been given service. Testifying the same day, Mr. Herbert conceded that Mr. Anstine had been willing to pay the construction charges involved."

"Edmund K. Miller testified on Wednesday, April 27, 1955 that he had had a phone at his present residence for the past 15 years, and that he was removing to West York in the next week. He said he had gone to the company a fortnight previously and applied for a phone at his new address, was told that they would have to investigate, and about 10 days later received a card from respondent stating they could not give him service at his new address. Mr. Miller stated he told the company he drives a milk tank truck; that most of his work orders come over the phone, and that since milk is a perishable commodity it is important for him to be available at all times so that he may handle emergency shipments."

"Richard K. Seitz testified . . . that he had applied for a phone for his fruit farm in March 1952. He said he has 100 acres of peach and apple trees; that during the harvest season he employs 100-125 workers, and that he urgently needs a phone on the farm. During 1954, he said he harvested a $41,000 crop, notwithstanding the damage from Hurricane 'Hazel.' Mr. Seitz said he complained to this Commission, which in July 1952 relayed to him a statement from respondent that service would be 'delayed for several months.' Nearly three years later, he still had no phone. Testifying later the same day, Mr. Herbert said part of the reason for the delay was that a line had to be constructed, and promised service 'soon after' August 1955. Mr. Herbert admitted that a *manpower shortage* increased this delay."

"Clarence W. Mitzel testified . . . that he had applied for service in March 1953; that after he and several others had filed a

inadequate its performance has been, notwithstanding the time and opportunity that were granted respondent by the Commission to correct the inadequacies found to have existed in our 1952 order . . . The record indicates that present difficulties were brought about, to use the words of our 1952 order, by a continuing 'lack of top-level planning and plan-execution.' . . . The record is replete with evidence that respondent . . . had deliberately chosen to refrain from expenditures for manpower which would have provided timely service, contrary to the express mandate of the Commission's order of 1952. Respondent clearly deserves to be penalized, and it cannot be objected that the imposition of fines would so weaken its financial structure that it would be, for that reason, unable to provide service to its customers. Mr. Rudy testified that respondent has ample financial resources. Respondent's annual reports to this Commission further reveal that it paid dividends of $78,000 per year for the years 1950-53 and $90,000 in 1954, a total of $402,000, and that respondent's unappropriated earned surplus at December 31, 1954 was more than $1.6 million."

The above comment of the Commission is amply supported by the evidence. The defense of the Company in reality is one of confession and avoidance. It admits its delinquencies but now attempts to justify them by the large sums expended in otherwise carrying out the program recommended by its engineers. The complaint of the Commission has been, not that the Company has accomplished little, but that it has not done more. It has refused to recognize any authority in the Commission to regulate its affairs under the police power of the State delegated to it in the Public

complaint with this Commission, respondent had promised him a phone by January 1955, which he had not yet received."

Utility Law. Cf. *Relief Electric L. H. & P. Co.'s Petition*, 63 Pa. Superior Ct. 1, 8; *Foltz v. Public Service Com.*, 73 Pa. Superior Ct. 24; *Shirk v. Lancaster City*, 313 Pa. 158, 165, 169 A. 557. In accordance with §907 of the Act, 66 PS §1347, the Company was obliged to comply with the Commission's regulatory orders. And as a corollary to its power to regulate, §902 of the Public Utility Law, 66 PS §1342, gave the Commission "full power and authority", and imposed upon it the duty, to enforce its orders.

When, therefore, the issue of compliance was raised in this proceeding it was for the Commission alone to determine whether its orders had been violated and to impose the penalties of §1301, 66 PS §1491, on proof that the Company had refused to perform the duties properly imposed upon it by the Commission. Cf. *Pa. P. U. C. v. Gornish*, 134 Pa. Superior Ct. 565, 573, 4 A. 2d 569; *Ryan v. Pa. P. U. C.*, 143 Pa. Superior Ct. 517, 17 A. 2d 637; *Duquesne Light Co. v. Upper St. Clair*, 377 Pa. 323 at 332, 105 A. 2d 287. Under §1301, supra, the Common Pleas of Dauphin County is given jurisdiction, to the exclusion of all other courts, but only to *recover* the penalties after they have been imposed by the Commission. The Company, by its defiance of the authority of the Commission to regulate its affairs reasonably, in the interest of the public, has invited the penalty imposed for its refusal to engage additional cable crews, and therefore must submit to it.

The Commission, in addition, imposed penalties on the Company in the total sum of $19,800 for "its persistent and unjustified failure" to provide service to the 22 applicants, above referred to, who had applied for service during the years 1946-1950 and who as of February 1, 1955 had not yet been supplied with telephones. We are convinced that these penalties were

improperly imposed. From the evidence it is apparent that the failure of the Company to supply these services was due in whole or in part in each instance, to its neglect to provide the additional cable crews enjoined by the 1952 order. In that respect the order of the Commission directing the Company to forfeit an additional payment of $19,800 is a duplication of and in cumulation of the cable crew penalties imposed. The two violations of the Commission's order, in reality in material respects, were but different phases of the same delinquency of the Company. The authority to impose penalties must be strictly construed. Statutory Construction Act of May 28, 1937, P. L. 1019, §58(1), 46 PS §558. It is the duty of a court to refrain from inflicting a penalty in case of doubt. *Com. v. W. Phila. Fid. Mannerchor*, 115 Pa. Superior Ct. 241, 175 A. 434. Cumulated penalties not expressly authorized by the Act may not be imposed. Cf. *Central Railroad Co. v. Green*, 86 Pa. 427; *Geffen v. Baltimore Markets, Inc.*, 325 Pa. 509, 191 A. 24; *Com. v. W. Phila. Fid. Mannerchor*, supra. On these principles the $19,800 in penalties imposed on the Company for failure to provide service to the 22 applicants must be set aside as cumulative.

We need refer but briefly to the remaining questions raised by appellant on other issues which do not involve the imposition of penalties.

The Company, as a temporary practice, admittedly was providing "multi-party (five or more persons on a line) service within base-rate areas at the same rate charged for a 4-party line service". The Commission found "that this practice is discriminatory and in violation of Section 402 of the Public Utility Law." Based upon these findings there can be no just complaint as to that part of the Commission's order which required the elimination of the practice within reasonable stated

periods applicable to several of the Company's exchanges.

The Company employed a cut-off device which terminated calls in local-service areas after five or six minutes. The purpose was to avoid additional capital expenditures. The Company's communications engineer testified that if the cut-off system were eliminated the trunk lines linking three outlying exchanges with the City of York would have to be doubled. The employment of a cut-off device in the first instance and the continuance of its use under varying conditions and circumstances may be a matter within the managerial discretion of those charged with the operation of the Company. Cf. *Pennsylvania Telephone Corporation v. Pa. P. U. C.,* 153 Pa. Superior Ct. 316, 33 A. 2d 765, in which we approved its continued use under wartime conditions, when telephone service itself was rationed because of the difficulty in securing favorable priority delivery of rationed trunking equipment and other essential materials. But unrestricted service should be the objective in cities the size of York and there is no good reason for the indefinite continuance of its use anywhere in the Company's franchise area; the company has the capital or the credit necessary to finance the change and essential manpower and construction materials are available. The Commission had the power, of its own motion in response to complaints lodged with it, to question the quality of service rendered by the Company as affected by the operation of the cut-off device. And after full hearing the Commission from the evidence in its "Finding IV" stated: "We find . . . that the use of said cut-off feature in fact results in inadequate, inefficient and unreasonable service" Based upon that finding the Commission ordered: "That respondent eliminate the use of time cut-off devices within a reasonable time" in accordance

with a program for such elimination as to exchanges and completion dates to be submitted by the Company. The finding is amply supported by the testimony and the Company must comply with the order in accordance with its reasonable terms.

The order of the Commission as to paragraph 11 imposing a total penalty of $19,800 for failure to supply service is reversed; otherwise the order is affirmed, imposing a total penalty of $32,750., which will bear interest from September 16, 1955, in accordance with our former order of October 3, 1955.

Concurring and Dissenting Opinion by Rhodes, P. J.:

I think the majority opinion limits the power of the commission to enforce, execute, and carry out the provisions of the Public Utility Law and the full intent thereof; and that it fails to adhere to the accepted principle that we shall not vacate or set aside an order of the commission, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights.

I concur in the conclusion of the majority that the penalty of $32,750 imposed for the failure to provide additional cable crews should be sustained. However, I cannot agree with the basis given for this conclusion. In my opinion, the penalty should be sustained on the ground that the utility, without justification, violated the specific order of the commission to provide the additional cable crews, and not, as the majority opinion indicates, because the absence of these crews was responsible for the failure to provide adequate and reasonable service to applicants. Under the circumstances,

the nature of the service rendered would not be a proper inquiry in the penalty proceeding on this violation of the commission's order. As to the $19,800 penalty for failure to provide service to twenty-two pre-1951 applicants, I agree that it cannot be sustained in its entirety. But I disagree with the majority that it is a duplication of the penalty imposed for failure to augment the cable crews, and I would sustain the imposition of this penalty to the extent of $1,100 because the utility failed in its statutory duty to provide adequate and reasonable service and facilities to the twenty-two applicants. See section 401, Art. IV, of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS 1171. It thereby subjected itself to a $50 penalty for each of the twenty-two violations, or a total of $1,100. See section 1301 (a) of the Public Utility Law, as amended, 66 PS 1491 (a).

The commission's order of October 6, 1952, specifically ordered the utility to augment its cable crews within thirty days of the service of the order in accordance with the recommendation of the utility's consulting engineer that three additional cable crews were necessary. The utility having taken no appeal from the commission's order of October 6, 1952, is now precluded from attacking that order. Moreover, there was no justification shown for the failure of the utility to comply. The validity and the wisdom of the commission's directive might have been questioned when it was made. It is too late to raise this question when a penalty is sought to be imposed for the utility's noncompliance. It seems to me that the majority would reopen the inquiry relative to the original order to the extent at least of determining whether the failure to comply results in, or tends to result in, inadequate and unreasonable service. This procedure requires the commission, before imposing penalties of this nature,

to determine again whether the conduct or corrections originally ordered would promote adequate and reasonable service for the public. The failure of the utility to explain its continued refusal to comply with the order of the commission was sufficient and proper reason to justify the penalty. When the commission, in accordance with section 902 of the Public Utility Law, 66 PS 1342, directed the utility to take certain action and the utility inexcusably failed to do so a penalty was properly imposed. I think that the commission's order was clear; that it was duly entered by the commission for the purpose of promoting adequate and reasonable service for the public; that there was acquiescence in the order by the utility to the extent that no appellate review was sought; and that it was ignored to the extent that the utility failed to comply. I would therefore affirm the imposition of the penalty on this ground alone.

The other penalty of $19,800, imposed for the utility's failure to provide service for twenty-two pre-1951 applicants, should be modified as I have indicated. But I think there is error in the majority opinion wherein it attributes the failure to supply service to these applicants to the utility's neglect to provide the additional cable crews, and concludes therefore there was a duplication of the penalty imposed for failing to add the additional cable crews. As the majority opinion observes, no individual explanation whatsoever was given for the failure to supply service to twelve of these applicants. In regard to nine others, the utility offered the explanation that certain new equipment (subscriber-carrier equipment), which was substituted for the original plan to install lead-covered cable, failed to function properly and had to be replaced with lead-covered cable as had been recommended initially. The lack of three additional cable crews was not a mate-

rial factor in the failure to render service to any of the twenty-two applicants. Although it is commendable when a utility installs new and better equipment, there was nothing offered in the present proceeding to explain the long delay involved. As a matter of fact, this new equipment was not even acquired until after the date when the service should have been provided. It is significant that no explanation was given for the failure to fulfill the original plan to install lead-covered cable prior to the cut-off date. There was testimony that the remaining single application continued unfilled because of a lack of manpower. The record, however, is barren of any proof that it was the lack of three additional cable crews that was responsible for the delay in supplying service to these twenty-two applicants.

The witness who testified concerning these twenty-two applicants concluded that "as an overall proposition" all deferred applications predating 1951 could have been filled prior to April 6, 1955, if the utility had had more manpower. He did not indicate how much prior to this date these applications would have been filled, and there was no further elaboration by the witness of the word "manpower." The term "manpower" is not synonymous with "cable crews." The former is more comprehensive than the latter. The term "manpower" could include splicing crews, installers, engineers, or employes in other essential positions. In my opinion, the utility completely failed to explain why these twenty-two applicants did not receive adequate and reasonable service. At most, the statement by the witness that all deferred applications predating 1951 could have been filled prior to April 6, 1955, if the utility had more manpower, is vague and indefinite, and it certainly does not support a conclusion that these applicants did not receive the service to which

they were entitled because the utility failed to add additional cable crews as directed by the commission's order of October 6, 1952. To reach such a conclusion the majority has made the term "manpower" synonymous with "cable crews." Had there been additional cable crews as ordered it does not follow on this record that service to the applicants would have been made available prior to the time they did receive service or prior to January 1, 1954, the final date found by the commission. No reasonable explanation having been given for the failure to render adequate and reasonable service to these applicants the commission was justified in imposing a penalty on the utility for this failure. It is mere conjecture to say that the lack of three additional cable crews caused this deficiency.

Although I would affirm the action of the commission in imposing a penalty under these circumstances, I would modify the amount of such penalty. It appears that the commission imposed the penalty for failure to supply these twenty-two applicants with service upon the premise that the commission by its order of October 6, 1952, found the utility's service to be inadequate, inefficient, and unreasonable in this respect, and that the order specifically required the utility to eliminate this condition. The commission having assumed that the utility violated its order proceeded to impose the penalty under section 1301 (b) of the Public Utility Law, as amended, 66 PS 1491 (b), which provides that each day's continuance in the violation of any regulation or final direction, requirement, determination, or order of the commission shall be a separate and distinct offense. Based upon a continuation in the violation for 396 days (from January 1, 1954, through January 31, 1955), the penalty at $50 per day aggregated $19,800. Although the commission's order of October 6, 1952, indicates that the utility's service

was found inadequate, inefficient, and unreasonable, the utility was never ordered to eliminate this condition within a reasonable time. The utility was merely required to submit to the commission a comprehensive statement of the results of its construction program that did, or would in the near future, eliminate the unsatisfactory condition. The utility having complied in this respect, it cannot now be said to have violated the commission's order. If it had been the intention of the commission to require elimination of the unsatisfactory condition, it should have done so in clear and unambiguous language as it did in section 2 of its order of October 6, 1952, wherein it directed the utility to augment its cable crews. In that section of its order the commission said that the utility "shall . . . augment its cable . . . craftsmen in accordance with the recommendation of its consulting engineer." I think the commission should have unmistakably ordered and directed the utility to eliminate the inadequate, inefficient, and unreasonable service within a reasonable time after service of its order.

Although, in my opinion, the utility did not violate the commission's order of 1952, in this respect, nevertheless the commission in its order of August 8, 1955, did find that the utility's service to these twenty-two applicants remained inadequate, inefficient, and unreasonable without satisfactory explanation therefor. This constituted a violation of the Public Utility Law. Section 401 of the Public Utility Law, 66 PS 1171, provides that "Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, . . ." The commission properly found that the utility failed to do so; and it was thus subject to the penalty prescribed for such violation. Section 1301 (a) of the Public Utility Law, as amended, 66 PS 1491 (a), provides a penalty of $50 for violation

of any of the provisions of the Public Utility Law; but, unlike the violation of an order of the commission as provided in section 1301 (b) of the Public Utility Law, as amended, 66 PS 1491 (b), the penalty did not accrue each day for the continued failure to remedy the deficiency as to service. The penalty should have been computed at $50 for each of the twenty-two unexplained failures to provide adequate, efficient, and reasonable service to the pre-1951 applicants. The failure to so provide service to each applicant was, in my opinion, a separate and distinct violation. The penalty to be imposed upon the utility would therefore be $32,750 for failure to comply with the commission's order to provide additional cable crews, and $1,100 for failure to provide proper service to the twenty-two pre-1951 applicants, or a total of $33,850.

Judge GUNTHER joins in this opinion.