Railway Express Agency Inc., Appellant, *v.*
Pennsylvania Public Utility Commission.

Argued September 30, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*William A. Schnader,* with him *Howard S. McMorris* and *A. M. Hartung,* for appellant.

*Harry H. Frank,* with him *Edward Knuff,* for appellee.

*Gilbert Nurick,* of *McNees, Hollinger & Nurick,* submitted a brief for intervenor.

OPINION BY PARKER, J., January 31, 1939:
This controversy had its origin in a movement by

railroad carriers to furnish to their patrons a collection and delivery service to and from the railroad terminals of freight in less than carload lots (hereinafter referred to as l. c. l. freight) by means of motor vehicles. A large number of carriers by rail entered into a written contract with Railway Express Agency, Inc., for the performance of this pick-up and delivery service as the agent of the railroad companies. The express company, on March 11, 1929, sought and obtained from the Pennsylvania Public Service Commission under the Public Service Company Law, then in effect, the "approval of the right to do the business authorized under its charter; namely, to engage in, conduct and carry on the express transportation business within the Commonwealth of Pennsylvania." In 1936, the express company began to furnish pick-up and delivery service of l. c. l. freight as agent for various large railroads and that service has since expanded.

The Public Service Commission then instituted an inquiry and investigation for the purpose of ascertaining whether the appellant had violated the Public Service Company Law. After hearing, the Public Utility Commission, which succeeded the Public Service Commission, issued on March 28, 1938, a final order directing that the appellant, "its agents and employes, forthwith cease and desist from furnishing collection and delivery service in intrastate commerce of less carload freight, unless and until it shall have first secured a certificate of public convenience authorizing such transportation." Various certificated motor carriers were permitted to intervene as complainants and a brief has been filed on their behalf. We are of the opinion that the record should be returned to the commission to the end that the appellant may have the opportunity to make good offers of material and relevant evidence which were excluded by the commission.

If all the important and interesting questions raised by the arguments presented to us were discussed, it

would unduly extend this opinion. We believe that the matter can be best presented by confining our discussion to two phases of the controversy. The express company argues (1) that it was authorized, by the certificate which it now holds, to perform the pick-up and delivery service which forms the basis of the order and of which complaint is made, and (2) that the commission's order was in violation of the commerce clause of the Constitution of the United States.

(1) Since the express company held a certificate of public convenience, it becomes important to determine whether the service in controversy which that company had been rendering to the railroads was within the terms of the certificate issued by the Public Service Commission. The charter of the respondent provided that the objects and purposes of the express company were, among other things, "to engage in, conduct and carry on......the express transportation business; and to handle, transport and forward by railroad, highway, water and air by means of such instrumentalities of transportation, carriage and conveyance as it may from time to time use, goods, wares, merchandise, money, bills, notes, bullion, packages, parcels and other movable personal property over and upon such lines and routes as may from time to time or at any time be established by it or with its approval." It was also given other broad powers which have no relation to express transportation.

When the former commission granted its certificate, it limited its approval to the "right to do the business authorized under its charter; namely, to engage in, conduct and carry on the express transportation business within the Commonwealth of Pennsylvania." It would seem clear that the certificate was limited at least to the "express transportation business" authorized by its charter. The commission, however, in its formal approval having made direct reference to the charter

410

powers of the company, the designated purposes stated in the charter may not be entirely ignored.

Under the Public Service Company Law, which was replaced by the Public Utility Law on June 1, 1937, the control of motor carriers by the commission was limited to those who were *common* carriers. The Public Utility Law is much broader than the act which it replaced and adds to the field of regulation a class described as "contract carrier by motor vehicle." The definition of that class specifically excludes common carriers by motor vehicles. If, as the appellant contends, pick-up and delivery service of l. c. l. freight performed by the express company for the railroads was not common carriage by the express company, and since the Public Service Commission had no jurisdiction over service that was not common carriage, it would seem to follow that the certificate of March 11, 1929, did not cover such service by the express company for the railroads.

Notwithstanding the admission of the appellant, we are not convinced that the service in question was not performed by the express company as a common carrier. "What constitutes a common carrier is a question of law but whether one charged with being a common carrier has by his method of operation brought himself within that definition is a question of fact to be determined from the evidence in each case as it arises": *Erb v. P. S. C.*, 93 Pa. Superior Ct. 421, 429. The record discloses that the express company's witnesses testified that the collection and delivery service of l. c. l. freight by the respondent was available to all railroads wishing to employ it. It did actually perform such service for many railroads. It was shown that appellant by its superintendent had declared: "The thing I want to call to your attention is that our management has notified the railroads that we are prepared to undertake this work 100% at each and every point." The express company had been performing a similar service with respect to goods entirely in its charge and was in the

business of serving the general public. The service shown to have been performed here with respect to l. c. l. freight was regular and continuous and not occasional, and a large number of trucks were employed in rendering such service. These and other facts unnecessary to detail lead us to the conclusion that the Public Utility Commission was warranted in finding that the respondent's operations with respect to the questioned service were those of a common carrier: *Erb v. P. S. C.*, supra; *Keystone Warehousing Co., v. P. S. C.*, 105 Pa. Superior Ct. 267, 161 A. 891; *Bingaman v. P. S. C.*, 105 Pa. Superior Ct. 272, 161 A. 892; *Klawansky v. P. S. C.*, 123 Pa. Superior Ct. 375, 187 A. 248.

It remains to consider the commission's contention that the certificate was not authority for the performance of any other common carriage than is comprehended under the phrase "express transportation business." This in turn involves an examination of the content of that phrase.

The commission assumed to determine the meaning of the phrase referred to without any expert testimony on the subject. Its conclusion was summed up by quoting from a former opinion as follows: "The certificate of public convenience issued to it by the Commission contemplated approval of railway express service as commonly understood. This service involves transportation of property on passenger trains with pick-up and delivery at each end of the route." While we do not propose to determine this phase of the controversy until the appellant has been given a further opportunity to furnish relevant evidence on the subject, we now indicate that we think the conclusion of the commission was based upon too narrow a construction of the phrase and that both the commission and the interveners have treated this branch of the case too lightly. It would not require much argument to convince any court that "express transportation business" is not limited to a service that involves transpor-

tation of property on *passenger trains*. Could it be maintained that this respondent was not acting within its certificate if the transportation by rail was on a milk train or a mail train or even by water or air? The passage of an entire train devoted to express service is not an uncommon sight on railroads.

Rate of speed cannot alone be a controlling factor. It is a matter of common knowledge that some freight trains are moved at a speed that compares favorably with that maintained by the average passenger train. Transportation by air is more speedy than by rail. We are also of the opinion that a distinction must be made between the service to be accomplished and the means or facilities employed in performing it. Consequently, we do not believe that the appellant is limited to employing the precise facilities and modes of operation that were used in former days. To so hold would prevent the adoption of many improvements in the public service without exceeding the powers originally granted.

The appellant made a number of offers (record 265a, 274a, 277a, 280a) to prove facts that would have thrown light upon the meaning of the phrase "express transportation business." All of these offers were rejected, exceptions were allowed, and the rulings are the subject of assignments of error numbers 14 to 18, inclusive. We regard it as clear error for the commission to have rejected these offers. While some of the offers may have contained matter of doubtful relevancy and, under strict rules, the offers might have been excluded as a whole, there were offers that were not subject to the objection. We think it clear that the commission excluded and intended to specifically exclude much testimony on the subject that was relevant and material, for it excluded practically all extraneous evidence that would be helpful in determining the meaning of the term and relied alone on the certificate, or perhaps depended upon expert knowledge possessed by the members of the commission without placing the facts relied upon in the

record in a proper manner. See *Klawansky v. P. S. C.,* supra (p. 379).

This problem is not one of the interpretation of the meaning of a single word but of a phrase whose meaning was fixed by the practices and usage of a particular trade or business. As Dean Wigmore points out (4 Wigmore on Evidence, §1955): "It is obvious that the interpretation of the meaning of the document in respect to ordinary words, being a part of the function of the court, is not for a witness to speak to. But so far as the words are technical, and the witness speaks to technical usage or meaning, there is no prohibition; the court must determine anew in each instance whether it needs any testimonial aid to interpret the word or phrase in dispute."

We are of the opinion that a situation was presented here where it was not only proper but necessary to hear evidence of the surrounding circumstances "that fill out the meaning of the words, as well as of any local or commercial meanings attached to particular words by usage." It cannot be said that the meaning of the phrase employed is free from ambiguity. It was therefore proper to receive evidence "de hors" the certificate for the purpose of explaining it. When it became apparent that the phrase bore a peculiar meaning in the trade or business to which the certificate related, that meaning was to be attributed to it. (See 5 Wigmore on Evidence, §§2461-2478.) The commission should have received evidence from those competent to speak as to the meaning of the term "express transportation business," not only as it was understood in that particular business, but also as its meaning was established by the general trade or business practices.

In determining the ultimate question involved in this branch of the case the commission should take into account the provisions in the respondent's charter determining the scope of its business and particularly note that the business to be performed and the means of per-

forming that business are separate and distinct matters for consideration. While the respondent could not enlarge the general purpose of its organization it was not limited to the precise means of performing its functions that may have been employed at former times. The charter itself, in the lines we have quoted, recognized that such means might be changed from time to time. It would only lead to absurdities to hold that a company was limited in the accomplishment of the purposes authorized by the certificate to the exact means employed at any one time, for this would ignore all progress. To state an extreme case, because express companies in 1929 usually transported freight by rail operated by steam does not mean that they might not transport their freight on a road operated by electricity. The respondent should be permitted to show the technical meaning of the phrase "express transportation business" as understood by those competent to speak on the subject, and it should also be permitted to show the facts and data which have been responsible for the meaning so given to the phrase.

(2) We are likewise of the opinion that certain offers of the appellant in support of its contention that the commission's order was in violation of the commerce clause of the federal constitution should have been received. This makes necessary further reference to the facts.

Railway Express Agency, Inc., was organized under the laws of Delaware by the principal railroad companies of the country for the purpose of conducting express transportation as their exclusive agent and to distribute its net revenues to the railroads on the basis of the express business transacted on their respective lines. It was not organized for the purpose of making a profit for itself and is not permitted to pay dividends. Ownership of its stock is restricted to railway companies (Securities and Acquisition of Control of Railway Express Agency, Inc., 150 I. C. C. 423). It filed

its power of attorney and statement in Pennsylvania in compliance with the Act of June 8, 1911, P. L. 710 (15 PS §3141) and received a certificate of public convenience, as we have heretofore shown, from the Public Service Commission. The appellant has since continuously conducted the express business as a joint facility with the railroad companies.

Pursuant to a public demand and at the suggestion of the Interstate Commerce Commission, beginning November 16, 1936, it furnished a pick-up and delivery service of l. c. l. freight made generally effective by virtue of tariffs filed with the Interstate Commerce Commission and the Pennsylvania Public Service Commission. Under the arrangement in force, l. c. l. freight is shipped under the railroad's bill of lading and the charge for the pick-up and delivery service is included in the charge for transportation of the freight, the railroad assuming responsibility for the shipment from door to door.

The appellant is willing to contract and has offered to contract with all railroad companies operating in Pennsylvania for a similar service. The service is performed with the appellant's own trucks and employees, and in picking up l. c. l. freight the appellant always issues to the consignor on behalf of the railroad the railroad's uniform bill of lading. The appellant's other shipments of express matter and l. c. l. freight are frequently carried on the same truck. On occasions, where the freight business does not justify the maintenance of its own trucks and employees, the appellant engages local trucks to act on its behalf under the direction of its local agent. At times the same employee serves as the agent of the railroad and as the agent of the appellant, and express and freight shipments are handled at the same office. More than seventy-five per cent of all l. c. l. freight business in Pennsylvania moves in interstate commerce, the interstate and intrastate shipments being mingled in transit,

carried on the same trucks, and handled by the same employees of the railroads and the appellant.

The contention of appellant that the order of the state commission is in violation of the commerce clause of the federal constitution involves an examination of different parts of the Interstate Commerce Act, Part I dealing with railway transportation and Part II dealing, inter alia, with motor carriers (known as Motor Carrier Act, 1935, 49 USCA §301, et seq.), and of the Pennsylvania Public Utility Law, 1937 (66 PS §1101, et seq.). After the appellant had filed tariffs with the Interstate Commerce Commission covering this pick-up and delivery service and before such tariffs were effective, two unsuccessful attempts were made to enjoin the railroads from rendering service under such tariffs: *Merchant Truckmen's Bureau of N. Y. v. U. S.*, 16 Fed. Supp. 998, and *Amer. Trucking Assn's. v. U. S.*, 17 Fed. Supp. 655. It was urged in the Merchant Truckmen's Bureau case that the railroads may not engage in pick-up and delivery service without having secured from the commission certificates of convenience, as required by the Motor Carrier Act, 1935, and the court held (p. 1000) : "The Commission held, and we think rightly, that by reason of the definition in section 203 (a) (14) of the act (49 U.S.C.A. §303 [a] [14]) the requirement that such certificates be secured is not applicable to the service in question." In the Amer. Trucking Assn's. case the court adopted the same construction of the acts in question and also pointed out that for more than fifty years some of the railroads were engaged in what is known as pick-up and delivery service in connection with the transportation by rail of merchandise traffic, and that such traffic was universally treated as an integral part of the railroad service, subject to regulation under Part I of the Interstate Commerce Act.

Attention was also called to the fact that while the courts and commissions had held that pick-up and delivery service was a component part of the railway

service, what is commonly known as line haul or over-the-road service, that is to say, from one city to another, was not subject to the jurisdiction of the commission under Part I of the Interstate Commerce Act. Consequently it was plain that Congress had notice of the distinction between these two kinds of service when, in defining "common carrier by motor vehicle," they made the definition subject to this provision (49 USCA §303 [a] [14]) : "Except to the extent that these operations are subject to the provisions of chapter 1 of this title." The court concluded that the effect of the exception taken with the balance of the definition was to leave pick-up and delivery service subject to the provisions of Part I and not to require any action under the Motor Carrier Act, but in the case of transportation by railroads on line haul or from city to city to require a certificate under Part II.

This matter has also had the careful consideration of the Interstate Commerce Commission. In an application by Scott Brothers, Inc., for a permit under the federal Motor Carrier Act, 1935, to engage in a collection and delivery service within New York City and Jersey City by written contract for two railroads (Scott Brothers, Inc., Collection and Delivery Service, 4 M. C. C. 551), the commission after reargument refused the application, holding with the district courts in the two cases last cited that the proposed operations would be carried on by the railroads and that the Motor Carrier Act, 1935, did not apply even to a trucker engaged in such service for the railroads.

We adopt the conclusion reached by the Interstate Commerce Commission that in the collection and delivery service of l. c. l. freight by railroads of interstate shipments, the regulation of such service performed either by the railroad or by an independent contractor is subject to Part I of the Interstate Commerce Act and a permit is not required by either the railroad or the trucker under the Motor Carrier Act, 1935.

In the collection and delivery of intrastate shipments of freight a different situation is presented, for the definitions of "common carrier by motor vehicle" and "contract carrier by motor vehicle" are not the same in the state statute as in the federal Motor Carrier Act, 1935. The definitions in the Public Utility Law do not contain the exception, "except to the extent that these operations are subject to the provisions of chapter 1 of this title," or other similar exception. If the movements of intrastate and interstate shipments of freight could be entirely divorced from each other and interstate transportation would not be adversely affected, we would hesitate to interfere with the conclusion of the state commission that a trucker should be required to obtain a permit under the state statute.

Passing this question for the time, the serious objection raised by the appellant is that the state commission refused to receive evidence tending to show the effect of the proposed order on interstate commerce.

"The decisions of this court respecting the validity of state laws challenged under the commerce clause have established many rules covering various situations. Two of these rules are specially invoked here— one that a state statute enacted for admissible state purposes and which affects interstate commerce only incidentally and remotely is not a prohibited state regulation in the sense of that clause; and the other that a state statute which by its necessary operation directly interferes with or burdens such commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted": *Shafer v. Farmers' Grain Co.*, 268 U. S. 189, 199, 45 S. Ct. 481.

"If the statute, reasonably interpreted, either directly or by its necessary operation, burdens interstate commerce, it must be adjudged to be invalid, whatever may have been the purpose for which it was enacted, and although the company may do both interstate and local business": *Western Union Telegraph Co. v. Kansas,*

216 U. S. 1, 27, 30 S. Ct. 190. Also, see *National Labor Relations Board v. Jones & Laughlin,* 301 U. S. 1, 57 S. Ct. 615.

That the matter should have serious consideration is shown by the facts that a large proportion of this questioned service by the appellant is interstate in character, seventy-six per cent on the New York Central system and the Pittsburgh & L. E. R. R., one hundred per cent in Philadelphia, and eighty-four per cent in Pittsburgh; that by reason of the attitude of the state commission two of the large railroads have abandoned the service; and that the general policy of the federal authorities and the state commission are not in accord. Under such circumstances the appellant offered several times to prove further facts with relation to the manner in which the order of the commission imposed a burden on interstate commerce and the offers were rejected.

The appellant made repeated efforts to place upon the record testimony intended to show that the interstate and intrastate business of appellant in the pick-up and delivery of l. c. l. freight were "so commingled that any attempt to separate them would be impracticable; that any such separation, if effected, would result in great inconvenience and expense to the railroads and their customers; and that in reality a prohibition of the appellant's intrastate service also prohibits it from handling interstate freight in Pennsylvania." The rejection of this testimony was made the subject of assignments of error numbers 5 to 12, inclusive, and 19 to 21, inclusive. All of this testimony was rejected as immaterial. The Public Utility Commission in its report did not discuss its right to reject this testimony, but the sitting commissioner indicated that such testimony would be pertinent and proper on an application by the express company for a certificate of public convenience to show the need for such a service and that it was immaterial in this proceeding, which was instituted solely for the purpose of determining whether a cease and

desist order should issue, effective until the appellant made application for and received permission from the commission to so operate.

That position does not give due consideration to the facts that the furnishing of this pick-up and delivery service was approved by the Interstate Commerce Commission when the tariffs covering such service were made effective by that body; that the federal authorities have held that such service was an integral part of the railway service and should be regulated by virtue of the powers granted the Interstate Commerce Commission by that portion of the law that dealt with the regulation of railroads rather than that the service of the appellant as an independent motor service should be regulated under the Motor Carrier Act, 1935; and that to accept the contention of the Public Utility Commission is to place the appellant in a position where such consent might be refused, if asked for, after the appellant had submitted itself to the jurisdiction of the commission and perhaps been bound thereby. If the commission was only interested in having the appellant submit itself to the jurisdiction and lawful control of the commission, it might be answered that the appellant has shown its willingness to have the certificate of public convenience issued to it by the Public Service Commission on March 11, 1929, construed as permission to render the various services as to which complaint is made, and that the service rendered is subject to regulation as a service performed by the railroads for the public.

We think that the commission should have permitted the appellant to offer any testimony which tended to show that a cease and desist order would, as a necessary result, directly interfere with or burden the interstate transportation service rendered by the appellant.

Any decision in this matter by this court is not final and questions are involved which might be the proper subject of an appeal to the federal jurisdiction. The

controversy is one in which the railroads and the public have a vital interest. In view of such interest and of the right of the appellant to develop fully the material facts upon which it relies, it ought not to be foreclosed by a decision until all relevant facts are placed upon the record. The appellant should have been permitted to show the respect in which and extent to which interstate commerce would be affected by an order preventing it from rendering intrastate collection and delivery service of l. c. l. freight for the railroads, that a separation of the interstate and intrastate services would result in undue inconvenience and expense or make it impracticable to render interstate service. It should also have been permitted to show the effect which the order would have upon the rendering of efficient service to the public at a reasonable price. The public is primarily interested in securing efficient service at reasonable rates, but sight must not be lost of the fact that even though this order were not made the service here complained of would still be subject to regulation by the federal and state authorities within their respective jurisdictions.

The order of the commission is reversed and the record is remitted to the commission for rehearing and for a determination of the matters in controversy in harmony with this opinion.

RHODES, J., would affirm the order of the Public Utility Commission for the following reasons: (1) The evidence was sufficient to support the Commission's order; (2) the Commission is not precluded by the Interstate Commerce Act or by the Motor Carrier Act, 1935, from making such order; (3) the order does not violate the commerce clause of the Constitution of the United States; (4) the order was such as the Commission had power to make.