**STATE of Missouri ex rel. ORSCHELN
BROS. TRUCK LINES, INC.,
et al., Appellants,**

v.

**PUBLIC SERVICE COMMISSION of
Missouri, Respondent,
and
Railway Express Agency, Incorporated,
Intervenor-Respondent.**

No. 24864.

Kansas City Court of Appeals.

Missouri.

June 3, 1968.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 7, 1968.

Application to Transfer Denied Nov. 9, 1968.

Carll V. Kretsinger, of Kretsinger & Kretsinger, Kansas City, Tweedie Fisher, Herman W. Huber, Jefferson City, for appellants.

Jeremiah D. Finnegan, General Counsel Public Service Commission of Missouri, Jefferson City, for respondent.

Sam D. Parker and David R. Smalley, Kansas City, for intervenor-respondent; Lathrop, Righter, Gordon & Parker, Kansas City, of counsel.

HOWARD, Presiding Judge.

This proceeding began with the application of Railway Express Agency, Incorporated, to the Missouri Public Service Commission for a certificate of public conven-

ience and necessity to operate as a common carrier by motor vehicle pursuant to the requirements of Chapter 390, RSMo 1959. (Unless otherwise specified, all statutory references are to RSMo 1959, V.A.M.S.) By this application Railway Express Agency, Incorporated (hereinafter referred to as REA) applied for authority for the intrastate transportation of general commodities moving in express service between Kansas City and St. Louis, Missouri, over a described route (generally U. S. Highways 40 and 50) and serving the intermediate and off-route points of St. Charles, O'Fallon, Wentzville, Truesdale, Jonesburg, Montgomery City, Columbia, Moberly, Jefferson City, Sedalia, Knob Noster, Warrensburg, Odessa, Blue Springs, Boonville, Mexico, Centralia, Auxvasse and Fulton. This application was opposed by six truck lines holding certificates as intrastate common carriers of freight to some or all of the points involved and by two bus lines whose certificates authorized them to transport express to some of the points involved. These protestants were allowed to intervene and appealed the decision of the Public Service Commission granting the certificate to REA to the Circuit Court of Cole County, Missouri, which affirmed the action of the Commission. Protestants have duly appealed to this court.

REA has for many years conducted an express business throughout Missouri and throughout the United States and internationally. Until the recent past, its express operation has been conducted in conjunction with the operation of railroad passenger trains. In State ex rel. Railway Express Agency, Inc., v. Public Service Commission, 237 Mo.App. 420, 169 S.W.2d 88, REA's organization and operation was described as follows:

"Appellant is engaged in the transportation of property by express throughout the continental United States, and is subject to the regulations of the Inter-State Commerce Commission, as to inter-state express operations, and to the regulations of the Missouri Public Service Commission, as to express operations in this state. It is a corporation organized under the laws of the State of Delaware and was organized in accordance with the plan designated as 'Report and Plan for Future Conduct of Express Business', dated June 21, 1928, which had as its objective to provide for the future conduct of the express business through a separate agency, but in effect a joint agency or facility of the railroads, controlled by them through stock ownership, which agency, after deductions required for its expenses in carrying on the business, would distribute all revenues received by it among its principals on the basis of the express business transacted on their respective lines. It became the exclusive agent for substantially all the railroads in the United States for the conduct of the express transportation business. It was not organized for the purpose of making a profit for itself, and can have no net income and may not pay dividends.

"The transportation service provided by express companies has always included, within certain designated zones, the collection of shipments by vehicle from the residence or place of business of the shipper and the delivery thereof by vehicle to the residence or place of business of the consignee without additional charge. This was the practice of appellant's predecessor companies and has been and is the practice of appellant. * * *"

█ After the express was collected from the shippers, it was transported to the railway station where REA shipped the goods in express cars attached to passenger trains. REA did not perform line-haul service itself but relied primarily on the railroads, and in some few instances other common carriers, to perform the line-haul transportation service for it. The overwhelming portion of REA's business was conducted by passenger train as contrasted to freight trains and other carriers. Dur-

ing the last ten years, the number of passenger trains operated in Missouri has steadily declined and we judicially know they have continued to decline since the hearing of this case before the Public Service Commission. As the result of this decline REA has fewer and fewer passenger trains on which to ship its express. With fewer trains to haul all of the express, the volume on each train increased and REA found that the trains did not stop at the stations along the way for a long enough period of time to permit it to load and unload all of its express. When there was not sufficient time to unload all of the express, that which was not unloaded was carried beyond its destination until REA was able to unload it at a station farther down the line where it was then held and shipped back to its destination on a later train going in the opposite direction. Likewise, express was delayed because there was not time to load all of the express on the train which would normally be expected to haul it and the express would therefore have to wait until there was an opportunity to load it on a later train. This resulted in delayed service and increased expense. REA complained about this situation to the railroads but got no relief. It was explained that if the trains were stopped for a longer period of time at intermediate stations to permit loading and unloading, they would miss connections at the gateway points of St. Louis and Kansas City. REA finally concluded that a different method of handling its express was necessary. Its witness testified that an attempt had been made to use freight trains but that this had proved unsatisfactory. It was then determined that REA would have to haul its own express by its own trucks. The present application was made in order to initiate this truck service over this route for intrastate operation in Missouri. A similar application for interstate operation on this same route was made to and approved by the Interstate Commerce Commission.

The appealing protesting truck and bus lines maintain that they can give adequate service to the points in question and that if the certificate is granted to REA it will adversely affect each of the protestants by taking business away from each of them. The bus lines point to their recent earning records showing that their passenger revenue has been failing and that their express revenue has been increasing as demonstrating the importance to them of this express business. The truck lines indicated that REA had not been a significant competitor in the past but that they expected that it would be in the future if this motor carrier certificate was granted. None of the witnesses for the protestants indicated how they expected this increased competition to come about except one of them based it on the newly aggressive attitude of REA.

In showing the need for the service REA produced testimony and exhibits showing the history of declining passenger train service and the inadequacies of existing service as heretofore summarized and the shipments actually received or originated at the points in question (except Kansas City and St. Louis) during the period, March 1 to March 31, 1965. The company witness testified that the company would save approximately $8,000.00 per month if it were permitted this truck operation as to both intrastate and interstate commerce. The evidence further shows that they were at the time of the hearing performing this truck operation as to interstate movements but were still moving all intrastate shipments by rail alone and that this was reducing their expected economies by approximately $1,500.00 a month, which could be saved if this intrastate certificate were granted.

REA also produced three shipper witnesses to support this request for a certificate. One was a resident of Jonesburg, Missouri (one of the points to be served), who raised and sold American water spaniels. He shipped some of the dogs sold by express. During all of 1964 and up to

June 12, 1965, he sold 55 dogs of which 5 were moved in intrastate commerce. 3 of the intrastate shipments were by express. He thought he would receive better service if REA carried its shipment by truck rather than shipping them by rail. The second shipper witness was traffic manager for Stark Bros. Nursery at Louisiana, Missouri. This point is not served on the route requested in this application but Stark Bros. Nursery does ship its nursery products to points on the route covered by this application. This witness very generally testified that he thought Stark Bros. Nursery would receive better service if REA were allowed to institute this truck operation. It was brought out on cross-examination that the products shipped by Stark Bros. were exempt and no certificate was required to haul them. The third witness was the assistant traffic manager for MFA at Columbia, Missouri. They make about 215 express shipments a year and had had difficulty with one common carrier shipment of a sample of gasoline from Carthage, Missouri to their laboratory at Columbia, Missouri. This witness also expressed his opinion that the proposed truck operation would result in better service to them. No other shipper witness was adduced concerning any of the other points or any of the other shippers on the proposed route.

Appellants contend that the Commission was without statutory authority to grant the certificate herein and that the order of the Commission granting the certificate is not supported by competent and substantial evidence upon the whole record. Their first contention is based upon the applicable statutes which envision that express business will be conducted by use of passenger rail service as it has been in the past. Thus, Chapter 386, which creates the Public Service Commission and provides for its powers, duties and procedures, contains a definition of "express corporation" in Section 386.020, paragraph 23, which reads as follows:

"The term 'express corporation,' when used in this chapter, includes every corporation, company, association, joint stock company or association, partnership and person, their lessees, trustees or receivers appointed by any court whatsoever, engaged in or transacting the business of transporting any freight, merchandise or other property for compensation on the line of any common carrier within this state."

Chapter 387 refers to the regulations of common carriers in general. The provisions of this chapter have particular application to railroads although they may apply to common carriers by motor vehicle as well. In this Chapter, Section 387.160 requires the railroads to make equitable distribution of their facilities to all shippers and for the Commission to make reasonable regulations to that end and provides in paragraph 3:

"The commission shall have power to provide the time within which express packages will be received, gathered, transported and delivered at destination, and the limits within which express packages shall be gathered and distributed without extra charge."

Section 390.220 requires the railroads on application of an express company "to make such arrangement and provide such facilities as will enable said express company to carry on and transact its said express business and to receive and discharge freight, valuables, money, jewelry and other property entrusted to it for transportation, at all the stations and stopping places on the line of said railroad, * * *." Section 390.230 provides penalties in the event that the railroad discriminates between the service and facilities it provides for competing express companies. Section 390.240 authorizes the public service commission to see that competition in the express business is not prevented by acts of the railroads and to bring suit against the railroads for violation of these statutes.

From these provisions appellants contend that REA is limited to conducting its express business by means of line-haul operations performed for it by the railroads and that the public service commission does not have authority to grant to REA a certificate to operate as a common carrier by motor vehicle. Appellants contend that the remedy for the declining railroad service which prompted this application lies in the enforcement of the provisions of these statutes and that these statutes provide the only remedy which REA is entitled to pursue. REA might have a remedy under these provisions but there is nothing therein which makes this the exclusive remedy and there is nothing in the provisions of Chapter 390 concerning the regulation of motor carriers which purports to or has been construed to prohibit the granting of motor carrier authority for the purpose of conducting express business. Therefore, appellants' first contention must be ruled against them.

As to appellants' second contention that the order of the commission granting this certificate to REA is not supported by competent and substantial evidence upon the whole record, we have a more difficult question. In order to arrive at the answer to this, we must first attempt to discover what authority is granted to REA by this certificate. The authority requested by REA in its application was for a route from St. Louis to Columbia, Missouri along U. S. Highway 40 with the exception that it swung north of Highway 40 for a short distance to serve Montgomery City; over Highway 63 from Columbia north to Moberly and back south to Jefferson City through Columbia; from Jefferson City west on Highway 50 to Warrensburg and thence north on Missouri Highway 13 to its junction with U. S. Highway 40 and on west on Highway 40 to Kansas City, serving both intermediate and off-route points. It asked for an alternate route for convenience only to fill in the gaps for direct operation along U. S. Highway 40 from St. Louis to Kansas City. The commission did not grant the certificate in this language. Rather, it concluded that REA desired to conduct a regular routes operation and restated the routes of the certificate so as to describe a route over highways serving each point named. The grant of authority in the "Ordered" portion of the Public Service Commission report and order dated the 27th day of September, 1966, reads as follows:

"ORDERED: 1. That upon compliance with the provisions of the Missouri Bus and Truck Law and the rules and regulations of this Commission applicable to common carriers by motor vehicle, Railway Express Agency, Incorporated, with local offices at 2413 Broadway, Kansas City, Missouri, holder of Certificate of Convenience and Necessity and Interstate Permit No. T–12,231, be and it is hereby granted additional authority to operate motor vehicles as a common carrier, restricted to transporting Railway Express Agency traffic moving on Railway Express Agency billing and under Railway Express Agency rates, as follows:

"*COMMON CARRIER, INTRASTATE REGULAR ROUTES:*

From St. Louis over U. S. Highways Alternate 40, By-Pass 40 and 40 (via St. Charles and Boonville) to Kansas City; from the junction of U. S. Highway 40 and State Highway 19, thence over State Highway 19 to Montgomery City; from Montgomery City over State Highway 161 to its junction with U. S. Highway 40; from Fulton over U. S. Highway 54 to Mexico, thence over State Highway 22 to its junction with State Highway 124, thence over State Highway 124 to Centralia; from Moberly over U. S. Highway 63 to Jefferson City; from Jefferson City over U. S. Highway 50 to its junction with State Highway 13 at Warrensburg, thence over State Highway 13 to its junction with U. S. Highway 40; and return over the

same routes, serving the Intermediate points of St. Charles, O'Fallon, Wentzville, Truesdale, Jonesburg, Montgomery City, Columbia, Moberly, Jefferson City, Sedalia, Knob Noster, Warrensburg, Odessa, Blue Springs, Boonville, Mexico, Centralia, Auxvasse, and Fulton, and with authority to render service between such points, on the one hand, and all other points served by Railway Express Agency, Incorporated, on the other hand.

"The authority granted herein is for the transportation of general commodities moving in express service subject to the following conditions:

"1. The service to be performed shall be limited to that which is auxiliary to or supplemental of express service of the Railway Express Agency, Incorporated.

"2. Shipments transported by applicant shall be limited to those on through bills of lading or express receipts.

"3. Such further specific conditions as the Commission, in the future, may find necessary to impose in order to restrict applicant's operations to a service which is auxiliary to or supplemental of express service of the Railway Express Agency, Incorporated."

We note that this authority is "to operate motor vehicles as a common carrier, restricted to transporting Railway Express Agency traffic moving on Railway Express Agency billing and under Railway Express Agency rates". This is recited as being a restriction but does it, in fact, restrict the authority? If the transportation is restricted to "Railway Express Agency traffic", that would seem to mean nothing more than property which some shipper had shipped by railway express. "Moving on Railway Express Agency billing" would seem to mean nothing more than that REA had issued its express billing for the property to be transported. Moving under Railway Express Agency rates would seem to mean that REA would charge the rates which it had previously established, which had been filed with and approved by Public Service Commission.

It is noted that the authority granted by the Public Service Commission "is for the transportation of general commodities moving in express service." Just exactly what constitutes express service is not made clear by the record. The authority to transport "general commodities" is not limited by the certificate itself and REA's testimony was that they held themselves out to and would transport anything and everything limited only by the condition that it be packaged, boxed or crated according to the requirements contained in regulations promulgated by REA. The packaging limitation does not appear in the certificate as granted and thus would apparently be subject to change at will by REA. The nature, extent and type of packaging limitation presently existing is not revealed by the record.

The provision that the commodities transported are limited to those "moving in express service" does not appear to have any precise or exactly defined meaning. The nature of express service is not defined by our statutes. Section 390.180 creates an obligation to accept and transport all things offered for shipment by the public and provides a penalty for refusal. This section provides in pertinent part:

"Each and every express company or carrier by express, doing business within the state of Missouri, shall at all convenient times during the hours of business accept and receive for prompt transportation and shipment, destined to points on their own line, or to points on the lines of other express companies operating within the state, or for points beyond said state, all property, parcels, money, merchandise, packages and other things of value, which may be offered to them, or either of them for transportation by the public, * * *."

This does not throw any light on the question of what attributes distinguish express service from the transportation performed by any other common carrier. The brief of appellants refers to the Commission's General Order No. 33–D, wherein express is defined in Rule No. 1[b] as "The term 'express' as used in this General Order means the transportation of small packages and light freight in connection with duly authorized passenger service." This General Order is promulgated under the authority granted by the Missouri Bus and Truck Law (Chapter 390) and obviously refers only to the express authorized to be carried on buses primarily engaged in passenger service. It is no help to us here. We note that in Auclair Transportation, Inc. v. United States (U.S.D.C.D.Mass.), 221 F.Supp. 328, cited by REA in another connection, the court referred to the definition of express service as set forth by the Interstate Commerce Commission, l.c. 332:

"The Commission's report in the instant case defined 'express service' to mean

'generally the expedited handling of small parcel traffic which common carriers of ordinary freight do not desire usually or are not able to perform. It is a service superior to that rendered as a rule by common carriers of general freight, and thus requires the payment of premium charges.'

and went on to observe:

'From this view it follows that express service is not susceptible of precise definition because it is, by its very nature, a service whose attributes of expediency, premium rates and special handling of freight must be judged in comparison with the services and rates provided and assessed usually by common carriers of ordinary freight.' Railway Express Agency, Inc. Extension-Nashua, N. H., 91 M.C.C. 311, 324 (1962)."

This definition does not precisely fit the service here in question. The testimony of the witnesses for REA was unequivocal that they presently do and would expect in the future under the certificate here in question to haul any commodities in any amount. Size and weight are not a factor subject only to the aforementioned packaging regulations which are not detailed in the record. REA's evidence set forth the characteristics of express service as being willingness and ability to handle anything anywhere; providing the care, attention and protection necessary, depending on the nature of the item shipped (such as high value merchandise and crated live animals); handling all traffic in expedited service, on regular schedules under tariffs that are relatively simple. It was explained that expedited service was the quickest possible handling of shipments moving over more than one route. This is accomplished by close coordination of schedules to prevent delay and lay-over at transfer points. REA also handles armed guard shipments, armed surveillance shipments and protective signature traffic. It feeds, waters and exercises live animal shipments and re-ices perishable shipments. Therefore, we must conclude that "moving in express service" encompasses anything and everything that REA decides to accept for transportation with no limit as to size or quantity.

The conditions imposed upon the authority here granted limit the service to be performed as follows: "The service to be performed shall be limited to that which is auxiliary to or supplemental of express service of the Railway Express Agency, Incorporated." This language was apparently originated by REA. We note that it has been incorporated into the authority granted by other regulatory bodies, which have been the subject of litigation in cases to which we have been cited. REA stated that it expected to continue to perform some of its transportation business by shipping from point to point on what few passenger trains remain available on the rail-

roads. Under this authority it expects to likewise use its own trucks to itself perform the line-haul transportation service from point to point. There will thus be a dual service. Any particular item may be either shipped from point to point by rail or hauled by REA trucks, at the option of REA. REA specifically requested that the authority not be limited to the movement of freight which has a prior or subsequent rail-haul movement. Thus, the authority sought and granted in the particular case is not "supplemental" or "auxiliary". It is designed to provide *the* express service independent of any and all other service performed by REA. There is no limitation that the commodities transported under the authority have a prior or subsequent movement by REA under other authorities held by the company. Consequently we can only conclude that the language used in this restriction to service which is "auxiliary to or supplemental of express service of the Railway Express Agency, Incorporated" has no real meaning or significance and can and should be ignored.

The second express condition attached to the authority is that "Shipments transported by applicant shall be limited to those on through bills of lading or express receipts." This again appears to be language originated by REA and which has been frequently used in authorities granted by other regulatory bodies but since the bills of lading or express receipts will be issued by REA, it would not appear to actually constitute any restriction or condition on the service authorized by the certificate. We therefore conclude that this authority is in fact unrestricted.

In addition to the regular route authority heretofore discussed, the certificate as issued also authorizes irregular route operation as follows: "And with authority to render service between such points, on the one hand, and all other points served by Railway Express Agency, Incorporated, on the other hand." This irregular route authority was not requested by REA and no mention of it is found in the record or in

the other parts of the Commission's report and order. It would authorize REA to operate its vehicles over any or all of the highways of the state of Missouri to, from and between each and every point specifically mentioned in the certificate and each and every other point in the state of Missouri served by REA. Thus, under this authority REA can, from the gateways of Kansas City and St. Louis and each of them, transport any and all commodities in its own vehicles to and from any point in the state of Missouri which it serves. The record indicates that it serves almost every community of any size in the state. This would also be true as to operations to and from any other point mentioned in the certificate.

■ It therefore appears that the certificate actually grants REA authority to transport anything and everything in any and every amount (subject only to its own uncontrolled limitation as to packaging which limitations are not required to be maintained by the certificate) between St. Louis and Kansas City and serving the named points and between these points and any other point in the state of Missouri. To support this, the evidence shows interstate and intrastate traffic moving in and out of the intermediate points for a period of one month's time in 1965, and the testimony of the three shipper witnesses heretofore set out. We conclude that this evidence is wholly insufficient to support the granting of this broad and unrestricted authority. In the first place, the evidence gives no indication of the need for the service into and out of the two largest points, i.e., St. Louis and Kansas City. It concerns the shipments of three dogs during the period of approximately a year and a half; one shipper in Columbia, and shipments by Stark Bros. from Louisiana, Missouri (a shipper of exempt commodities from an off-route point) to points on this route as part of their blanket coverage of the whole general area and perhaps the whole United States. No shipper witnesses testified concerning need for such service

at any of the other named points and the statistical evidence of past service by rail, standing alone, is not sufficient to show public need for the service. With the exception of the witness from Stark Bros., there is no evidence whatsoever to support the irregular route portion of the authority granted. Thus, there is no evidence upon which the commission could base a finding of public convenience and necessity for this authority. When this evidence is compared to that considered in such cases as State ex rel. Potashnick Truck Service v. Public Service Commission, Mo.App., 129 S.W.2d 69, and State ex rel. Byers Transportation Co., Inc. v. Public Service Commission, Mo.App., 246 S.W.2d 825, and the evidentiary requirements necessary to support a finding of public convenience and necessity as set out in those cases, it is apparent that the finding of public convenience and necessity to support the granting of the certificate here in question, is not supported by competent and substantial evidence upon the whole record.

This deficiency in the evidence apparently results from a misconception of the applicant. It contends that this is not a new service but that it is merely a continuation of the same service substituting hauling in its own trucks for shipping on railroad passenger trains and that, therefore, much less supporting evidence is required than would be required for a new service. Its brief contains the following statement: " * * * the quantum of proof in a case such as ours is much less than that required on an application for the original issuance of a certificate of public convenience and necessity."

■ In the sense that REA will transport property for a shipper from Kansas City to Jefferson City (for example), this contention that the proposed truck operation does not constitute a new service may be true. However, on that basis, the same service is performed by REA, by the airlines, by the railroads, by the motor vehicle common carriers, by the bus lines, and by any other mode of transportation. Under this contention, any carrier using one mode of transportation would be entitled to conduct its business by any other mode of transportation without showing public convenience and necessity therefor. This conclusion does not follow. The service to be performed under this certificate and the service heretofore performed by REA does move freight from the same points of origin to the same points of destination. However, in the past REA has merely collected the freight from various shippers and has then shipped the various items of freight in aggregate by the railroads, in express cars moving as part of passenger trains, and then when the railroads bring the freight to the point of destination, has distributed and delivered the freight to the various consignees. Under the present certificate REA will for the first time perform its own line-haul service by motor vehicle. This is an entirely new service. Instead of shipping by railroad it now performs its own line-haul service. REA now for the first time proposes on this route to operate over-the-road vehicles (as contrasted to pickup and delivery vehicles). Section 390.051, paragraph 1, provides in part as follows:

"Except as otherwise provided in section 390.031 [the exemption provision], no person shall engage in the business of a common carrier in intrastate commerce on any public highway in this state unless there is in force with respect to such carrier a certificate issued by the commission authorizing such operations."

Paragraphs 4 and 5 of this section require the commission to find from the evidence that public convenience and necessity will be promoted by the grant of the certificate provided for and in reaching this conclusion, the commission is required to consider other available transportation service presently being furnished. These paragraphs read as follows:

"4. If the commission shall find from the evidence that public convenience and

necessity will be promoted, or that there is public need for the creation of the service proposed, or any part thereof, and that the applicant is qualified properly to perform the service proposed and to conform to the provisions of sections 390.011 to 390.176 and the requirements, rules and regulations of the commission established thereunder, a certificate therefor shall be issued.

"5. In determining whether a certificate should be issued the commission shall give reasonable consideration to the transportation service being furnished by any common carrier by rail or motor vehicle and the effect which the proposed transportation service may have upon such carriers; provided, that the issuance of a certificate of convenience and necessity to one carrier shall not prohibit the granting of such certificate to another carrier over the same route if in the opinion of the commission the public convenience and necessity will be promoted by so doing."

Until and unless these requirements are met, the commission is not authorized to grant a certificate for this new motor carrier service. As heretofore indicated the evidence on the whole record is not sufficient to support such required findings.

Our Supreme Court in State ex rel. Missouri Pacific Freight Transport Company v. Public Service Commission, Mo., 295 S. W.2d 128, specifically held that the carrier must show public convenience and necessity for any new or expanded service that it proposes. The court said, l.c. 132:

" * * * It would seem relator had and has no right to render any type or kind of common-carrier service, or part thereof, except under authority by the Commission granted upon Commission's determination of public convenience and necessity. The Commission has the responsibility of determining the public's need for common-carrier service sought and of considering a new, enlarged, extended or additional, and duplication of

service would adversely affect presently authorized carrier service with resultant deterioration of efficiency in adequately supplying the transportation needs of the public. In the determination of these matters, the rights of an applicant, with respect to the issuance of a certificate of convenience and necessity, are considered subservient to the public interest and convenience. (Citing cases.)

"Commission's power (with regard to regulation of motor carriers as delegated to it by the legislature in the Motor Bus Regulation Act, L.1927, p. 402) carried with it the express correlative duty, before granting a certificate authorizing service by any motor carrier, of determining 'that public convenience and necessity will be promoted by the creation of the service proposed, or any part thereof * * *.' And in determining whether or not a certificate of convenience and necessity should be issued, it was directed that Commission 'shall give reasonable consideration to the transportation service being furnished by any railroad, street railway or motor carrier * * *.' "

In the past the Missouri Public Service Commission in granting authority to REA to render pickup and delivery service beyond established commercial zones has emphasized that the lack of support by shipper witnesses required the denial of such unsupported applications. See Re Railway Express Agency, Inc., 10 Mo.P.S.C. (N.S.) 384. The certificate granted in the case at bar is not supported by such evidence as was required by the P.S.C. itself in that case.

REA cites cases from other jurisdictions wherein truck operation was authorized by REA. In Auclair Transportation, Inc. v. United States, U.S.D.C. District of Massachusetts, 221 F.Supp. 328, affirmed 376 U. S. 514, 84 S.Ct. 966, 11 L.Ed.2d 968, the ICC had granted a certificate for truck operation over various routes in New England. The court held that the evidence in

that case would constitute proof of public convenience and necessity for the proposed operation and that the granting of such truck authority was not contrary to the national transportation policy as laid down in the National Transportation Act. In Point Express, Inc. v. P. S. C. of West Virginia, 148 W.Va. 732, 137 S.E.2d 212, the Supreme Court of West Virginia held that there was sufficient proof of public convenience and necessity to authorize substitution of truck transportation for discontinued rail transportation from Huntington, West Virginia to West Hamlin and Logan, West Virginia. In Application of Railway Express Agency, Inc., 157 Me. 223, 170 A. 2d 380, the Supreme Judicial Court of Maine considered authority authorizing REA to substitute truck service for discontinued rail service pursuant to specific statutory provisions and held that under the statutes the applicant had produced sufficient evidence of public convenience and necessity to justify granting a certificate. It is noted that the statutes considered in the last case have no parallel in Missouri. In Railway Express Agency, Inc. v. Pennsylvania Public Utility Commission, 134 Pa.Super. 405, 4 A.2d 176, the Supreme Court of Pennsylvania remanded to the Public Utility Commission for the hearing of additional evidence and a determination of the issue of whether or not REA's performance of pickup and delivery service of railroad freight as an agent for the railroads came within the authority held by REA to do "express business".

We have carefully considered these and other cases relied on by REA but find that they are not determinative of the problem presented in the case at bar and we likewise note that in each instance where the grant of a certificate was in question, the court found that there was sufficient evidence to support a finding of public convenience and necessity.

For the foregoing reasons, we conclude that the Public Service Commission order granting this certificate to REA is not supported by competent and substantial evidence upon the whole record and therefore the judgment of the trial court affirming the order of the Public Service Commission is reversed and the cause is remanded to the trial court with directions to remand the cause to the Public Service Commission for further proceedings.

All concur.