**State ex rel. ELDON MILLER, INC., et al., Appellants,**

v.

**PUBLIC SERVICE COMMISSION et al., Respondents.**

**No. 25508.**

Kansas City Court of Appeals, Missouri.

June 7, 1971.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 1971.

Herman W. Huber, Jefferson City, for appellants, Eldon Miller, Inc. and Truck Transport, Inc.

Hendren & Andrae by John E. Burruss, Jr., Jefferson City, for appellants, Ruan Transport Corp. and Schwerman Trucking Co.

T. M. Tahan, St. Louis, and Thomas P. Rose, Jefferson City, for intervenor, Slay Transportation Co., Inc.

Jeremiah D. Finnegan, Gen. Counsel, Dale E. Sporleder, Asst. Gen. Counsel, Missouri Public Service Comm., Jefferson City, for respondent.

HOWARD, Judge.

This is an appeal from the action of the Missouri Public Service Commission granting a certificate of public convenience and necessity to Slay Transportation Company,

Inc. The circuit court affirmed the action of the Commission and appellants have duly appealed to this court.

Applicant applied for a certificate authorizing irregular route intrastate transportation of all commodities in bulk between all points and places in the state of Missouri. Thirty-one truck lines intervened in opposition to the .application. Twenty-nine of these opponents participated at the beginning of the hearing. The hearing of testimony covered several days and the transcript before the Commission consists of 1,154 pages. During the progress of the hearing, twenty-four amendments were made to the application. Each amendment restricted the requested authority in some manner, either as to commodity or location, or both. These amendments eliminated many of the protesting carriers. The Commission did not grant the unlimited authority requested; rather it granted common carrier, intrastate, irregular route authority to transport "(1) acids, chemicals and fertilizers in bulk, and raw materials used in the manufacture of acids, chemicals and fertilizers, in bulk, between all points and places in Missouri, and (2) commodities in bulk, and having a prior or subsequent haul by railroad, between railheads of the Norfolk and Western Railway, on the one hand, and all points in Missouri, * * *" This authority was expressly limited by the twenty-four amendments heretofore referred to, some of which were and some of which were not applicable to the authority as finally granted. Four protesting truck lines obtained review of the Commission's action by the circuit court and they are the appellants here. Slay Transportation Company intervened in the proceedings and stands in the position of respondent along with the Public Service Commission.

Slay Transportation Company is a common carrier with interstate authority to transport certain commodities in bulk throughout the United States. It also has substantial intrastate authority heretofore granted by the Missouri Public Service

Commission. Under this authority applicant has performed extensive transportation services for Monsanto, both interstate and intrastate. The Commission described this present intrastate authority as follows:

"* * * As pertinent to this proceeding, Applicant's intrastate authority authorizes the transportation of: (1) acids, chemicals, paints, varnishes, resins and lacquers, in bulk, in specialized vehicles, from St. Louis, Missouri, and points and places in its commercial zone, to all points in Missouri, subject to minor specific exceptions; (2) lime and lime products from Mosher to St. Louis and its commercial zone; (3) denaturants, alcohols, acids, varnishes, paints, resins and lacquers, in bulk, in specialized vehicles from all points in Missouri to St. Louis and its commercial zone, excluding any transportation of gasoline, petroleum products and liquid fertilizer, (4) ammonium nitrate, urea, fertilizer, fertilizer materials and fertilizer ingredients, other than liquid, from the plant site of American Cyanamid Company at South River to all points in Missouri; and (5) printer's ink, in bulk, in tank vehicles, from Overland to all points in Missouri. * * *"

Applicant denied seeking any duplicating authority but it is apparent that the authority as granted herein would in substantial respect duplicate some of the authority presently held.

In support of this application, the testimony of Mr. Slay, the president of applicant, and witnesses from six supporting shippers were presented. Because the authority granted is more limited than the authority requested, the testimony of three of the shipper witnesses is not applicable to the issues presented on this appeal. Thus, the authority as granted was supported only by Monsanto Company, Missouri Farmers Association and the Norfolk and Western Railway. The testimony of Mr. Slay covers 215 pages of the transcript. He testified that he had been re-

quested to apply for this broad authority by the Monsanto Company and by another company which is not interested in the limited authority granted. The balance of his testimony can be fairly summarized as follows: Mr. Slay did not have the slightest idea what commodities might be transported under the authority and if any commodities were transported, he had no idea where they would be shipped from or where they would be shipped to. His testimony gave no indication whatsoever as to what services might be performed by his company if the requested authority, or any part thereof, was granted.

The witness from Monsanto was in charge of its bulk transportation department. He testified that Monsanto had three manufacturing facilities in St. Louis, Missouri and its commercial zone, one at St. Peter's, Missouri (in St. Charles County), and one at Bonne Terre. It also had what were called "Monsanto Agricultural Centers" at Charleston, Hunterville, Kennett and Portageville, all in the southeast corner of Missouri, and a rail-to-truck transfer facility at Kansas City, Missouri. He also testified as to six pipeline terminals scattered over Missouri, but since these points were involved in the shipment of petroleum and petroleum products which is not within the purview of the authority as granted, this aspect of his testimony is no longer pertinent.

One of the three Monsanto plants in St. Louis manufactures a wide range of acids and chemicals. The second plant manufactures phosphates and the third is a bottling plant where they make various containers for bleaches, soaps, etc. The plant at St. Peter's manufactures silicons and the plant at Bonne Terre is a "nitro-carbo-nitrate plant." The four agricultural centers bring together various types of fertilizer ingredients and blend them specifically for demands of the farmers in the area. The rail truck transfer facility is a storage point where Monsanto utilizes its tank cars or hopper cars (rail cars) to bring in products from other points in the state of Mis-

souri and from outside the state of Missouri, which are transferred to trucks for delivery to the customer.

The witness gave what he described as "a representative list of 17 points" where Monsanto had customers who purchased its products "in major quantities." These points were Sikeston, Kansas City, Louisiana, Montgomery City, Glasgow, Bowling Green, Delta, Auxvasse, Advance, Portageville, East Prairie, Morley, Gordonville, St. Louis, Licking, Jackson and Springfield. He also testified generally that Monsanto shipped to and from many, many points in the state of Missouri but he did not further specify. He testified that Monsanto shipped approximately 700 million pounds of commodities in intrastate commerce in Missouri in 1967. About 90% of this was shipped in bulk. This represents the shipment of products manufactured by Monsanto to its customers, shipments between the various plants of Monsanto and the shipment of raw materials and other needed items from various points in Missouri to the various Monsanto plants. The authority as granted would authorize the transportation of only a part of the items shipped by Monsanto (it does not cover petroleum and petroleum products, for example) but the record gives no indication of what proportion of Monsanto's gross shipments could be transported under it.

The witness testified that Monsanto had present plans to establish new facilities in Missouri. It planned to expand its agricultural centers in the state and had "a future major plant site planned in the state." However, the witness refused to specify any points being considered for such expansion because such information was "highly confidential and I am not allowed to divulge this at this hearing." He did not give any indication as to when any new facilities would be constructed. The witness testified generally that there had been occasions when Monsanto had difficulties with or had been unable to secure transportation from existing carriers but

he was either unable to, or unwilling to, give specific information on this subject. He stated that he was not present for the purpose of complaining about the service rendered by existing carriers.

The witness testified that Monsanto was currently engaged in setting up a computer operation to quickly gather all shipping information on inbound and outbound movements on an up-to-the-minute basis so that they would be able to coordinate inbound and outbound shipments and thus eliminate much of the empty mileage that the trucks now run. On shipments from Monsanto plants, the trucks go out loaded. If there is no return load, the truck must return empty. It was expected that this computer operation would enable Monsanto to find a load which the truck could haul back, thus eliminating the empty return and eliminating the need of sending an empty vehicle to pick up the load that was coming back in. He also testified to a need for split deliveries and for split pickups. Also, a vehicle, after delivering Monsanto products, might be used to haul a load, not back to the point of origin but to a different Monsanto plant.

The witness testified that the possibility of securing back hauls rather than returning vehicles empty was only one of Monsanto's interests in the granting of this authority. He stated "our primary interest is developing service at future potential plant site points to help out our primary carriers that serve these points in time of emergencies when they can't provide equipment, or they can't give us the service we need, we have got a carrier that is flexible enough to move around within the State and help us." All of this testimony was extremely general in nature. The witness was repeatedly pressed to give specific information as to what commodities would be moved under the authority and from what points and to what points the shipments would be made. In answer to specific questions the witness either stated that he did not know, or, if he knew he would not tell. He stated he was unwilling to give

any information as to the volumes of particular commodities moving between identified points in the State of Missouri.

The witness from Missouri Farmers Association testified in support of the authority that MFA was at the time of the hearing building a fertilizer plant at "South River" near Palmyra in Marion County, Missouri, and the Central Farmers Fertilizer Company was constructing on MFA's land an anhydrous ammonia storage facility. MFA expected to ship approximately 850 trailer loads of dry fertilizer and 500 trailer loads of anhydrous ammonia, per year from this site to its various exchanges throughout the state. The great majority of these shipments would be made in the spring, from March to June, and MFA was desirous of securing authority for all of the carriers it could because, as the witness stated, at the peak of the fertilizer shipping season, there just aren't enough vehicles to meet the demand.

A witness from Norfolk and Western Railway testified in support of the application that the railroad maintained numerous "team tracks" or sidings at various places along its main lines onto which freight cars could be switched for loading or unloading by the shippers or by the consignees. He further testified that the railroad was investigating the possibility of establishing a bulk storage facility where bulk commodities could be stored or warehoused and then shipped to the ultimate consumer by truck. The locations of such facilities would probably be either in St. Louis, Kansas City, or in the center of the state in the Moberly area. This testimony was very indefinite and nebulous. It appears that the railroad was investigating possibilities along these lines but no firm plans had been reached. He testified generally that the railroad hoped by this means to service customers as far as 150–200 miles from its main line. No destination points were mentioned, even in speculation.

It was on the basis of this testimony that the Public Service Commission found that there was a public need for the authority as granted and that the granting of such authority would serve public convenience and necessity. Appellants here contend that this conclusion is not supported by competent and substantial evidence upon the record as a whole. We conclude that the appellants are correct in this contention.

The evidence given by the witness from MFA would support the conclusion that public convenience and necessity would be served by the granting of authority to haul dry fertilizer and anhydrous ammonia from the plant being constructed by MFA at South River. However this is the only evidence which tends to support any need for transportation service authorized by the certificate granted by the Commission. Such evidence would in no way support the broad geographical scope of the certificate.

As to both Monsanto and the Norfolk and Western Railway, the evidence did not run to a present need but pertained only to speculation as to what might, perhaps, maybe, develop in the future. Both companies testified to rather vague plans for the construction of additional facilities in the state. Neither witness knew, or if he knew he would not tell, where or when these facilities would be constructed. Thus, there is no way of knowing, in fact we cannot even guess, whether or not the transportation service authorized at the point where the new facilities will be constructed would be adequate or whether additional authorization would be required. There are thousands of places in the state of Missouri where one or more of these facilities might be constructed. It is certain that these shippers will not construct a facility at each and every one of these points although the certificate, as authorized by the Commission, authorizes transportation from and to each and every one of these points.

This is pure "pie in the sky." The shippers want a blank check which they can fill in at their convenience to authorize

service when and if they desire it at some unknown point and at some unknown time in the future. Such evidence will not support a conclusion that the authority as granted by the Commission will serve the public convenience and necessity. There is simply no way of determining, from this evidence, whether or not necessity exists for additional transportation. Not knowing where this future construction would take place, it would be impossible for the Commission to determine (as it recites it did), what effect this new authority would have upon presently authorized carriers.

■ Although the fact situations in the reported cases do not parallel the fact situation in the case at bar, the case law of Missouri requires that an applicant for a certificate of public convenience and necessity show by *evidence* that the public convenience will be enhanced and there is a reasonable necessity for the transportation service requested. See, among the many cases, State ex rel. Missouri Pacific Freight Transport Company v. Public Service Commission, Mo., 295 S.W.2d 128; State ex rel. Potashnick Truck Service, Inc. v. Public Service Commission, Mo. App., 129 S.W.2d 69; State ex rel. Transport Delivery Company v. Burton, Mo. App., 317 S.W.2d 661; State ex rel. Associated Transports, Inc. v. Burton, Mo.App., 356 S.W.2d 115; and State ex rel. Orscheln Bros. Truck Lines, Inc. v. Public Service Commission, Mo.App., 433 S.W.2d 596.

■ The evidence given by the witness from the railroad showed conclusively that the railroad was supporting this application solely on the basis of speculation as to what might be desirable or useful in the future and not on the basis of present need. The testimony of the witness from Monsanto showed that if the authority requested were granted they might, perhaps, be able to arrange loads for a back haul where otherwise the truck would return empty. This was pure speculation and the witness refused to give any information as to what might be hauled or the points from and to which it might be hauled. Furthermore, his testimony was that the company's prime interest was not in securing authority for a "back haul" but in having an authorized carrier to be called upon in the event the prime carriers were unable to provide the service desired. This was with special reference to future expansion of facilities by Monsanto which might or might not occur; if it did occur it would be at some unspecified time in the future and at points or places either unknown or which the witness refused to divulge. All of this evidence can only be characterized as constituting conclusions, speculation, guesswork and wishful thinking on the part of the witnesses. It has no substance. As before mentioned, there was substance to the testimony of the witness from MFA but the need for transportation shown by his testimony does not support the wide geographical scope of the certificate as granted by the Commission.

Having concluded that the report and order of the Commission is not supported by substantial evidence on the record as a whole, it follows that the judgment of the circuit court should be and it is hereby reversed and the cause is remanded to the circuit court with directions to remand the cause to the Public Service Commission for further proceedings in accordance with this opinion.

All concur.